## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

**HEATHER FORSTER,**

|  |  |
|---|---|
| Plaintiff | **CAUSE NO.:** 5:21-cv-765 |

v.

**BEXAR COUNTY, "Unknown/Unnamed" Officers/Employees of BEXAR COUNTY, SHERIFF JAVIER SALAZAR, Individually and Officially as an agent and/or employee of Bexar County Sheriff's Office, "Unknown/Unnamed" Officers/Employees of BEXAR COUNTY, SHERIFF JAVIER SALAZAR, BEXAR COUNTY HOSPITAL DISTRICT d/b/a UNIVERSITY HEALTH SYSTEMS, "Unknown/Unnamed" Officers/Employees of BEXAR COUNTY HOSPITAL DISTRICT d/b/a UNIVERSITY HEALTH SYSTEMS, BEXAR COUNTY PRETRIAL SERVICES, SAPD OFFICER JESSE SALDANA, Officially as an agent and/or employee of San Antonio Police Department, CITY OF SAN ANTONIO,**

Defendants.

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES HEATHER FORSTER, complaining of and about BEXAR COUNTY, SHERIFF JAVIER SALAZAR, BEXAR COUNTY HOSPITAL DISTRICT d/b/a UNIVERSITY HEALTH SYSTEMS, the CITY OF SAN ANTONIO, and SAPD OFFICER JESSE SALDANA,

1

hereinafter called "Defendants," and for cause of action shows unto the Court the following:

## I.   INTRODUCTION

1.      This case arises from the callous treatment of Heather Forster ("Heather" or "Plaintiff"), 43-year-old nurse who was arrested at her home while experiencing a mental health crisis.

2.      Heather had a history of bipolar disorder.  Bipolar disorder, formerly called manic depression, is a mental health condition that causes extreme mood swings that include emotional highs (mania or hypomania) and lows (depression).  Defendants were aware of Heather's bipolar disorder.  While in Defendants' care, Heather improperly was given lithium, which lead to lithium toxicity.

3.      Due to the lithium toxicity, Heather suffered terribly both mentally and physically.  Ultimately, Heather had encephalitis, was in a coma for several days, and required multiple dialysis treatments.  As a result, Heather also suffered a decline in her functional status and required aggressive PT/OT to regain her strength.  Heather was admitted to rehabilitation for ongoing medical management and aggressive PT/OT therapy.

4.      During her hospitalization, the criminal charges against Heather were dropped.  Following rehabilitation, Heather was discharged to her home and family care.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the claims raised in this Complaint under 42 U.S.C. § 1983, 28 U.S.C. §§ 1331 and 1343, and the Eighth and Fourteenth Amendments to the United States Constitution.

6.     Venue is appropriate in the Western District of Texas under 28 U.S.C. § 1391 as Defendants are residents of the Western District of Texas, and the acts complained of arose in the Western District of Texas.

## II.     PARTIES AND SERVICE

7.     Plaintiff, HEATHER FORSTER ("Heather" or "Plaintiff"), is an individual, who resides in San Antonio, Bexar County, Texas and is otherwise sui juris.  Heather previously was married and known as Heather Aguilar.

8.     Defendant BEXAR COUNTY is a municipal corporation organized under the laws of the State of Texas.[1]  The Bexar County Sheriff's Department is a division of Bexar County and operates the Bexar County Jail.  Bexar County may be served with process by serving Nelson Wolff as County Judge of Bexar County, at 101 W. Nueva, 10th floor, San Antonio, Texas, 78205. In addition, service of Bexar County can be effected by personal delivery.

9.     Defendant SHERIFF JAVIER SALAZAR ("Sheriff Salazar") is named officially and individually, and may be served with process at 200 N Comal, San Antonio, Texas, 78207. At all times relevant to this cause, Sheriff Salazar was operating in the course and scope of his agency and/or employment relationship with the Bexar County Sheriff's Office. Under Tex. Local Gov't Code § 351.041 and Tex. Code Crim. Proc. Art. 16.21, the Sheriff is responsible for those incarcerated at his jail and is "the keeper of the county jail," "shall safely keep all prisoners committed to the jail," and "shall continue to exercise supervision and control over the jail." It is Sheriff Salazar's responsibility to hold detainees in a manner consistent with his oath to uphold

---

[1]     "A municipality is liable under this chapter for damages arising from its governmental functions, which are those functions that are enjoined on a municipality by law and are given it by the state as part of the state's sovereignty, to be exercised by the municipality in the interest of the general public."  Tex. Civ. Prac. & Rem. § 101.0215.

both the Texas and United States Constitutions. [2]   It is Sheriff Salazar's responsibility to hold detainees in a manner consistent with his oath to uphold both the Texas and United States Constitutions. The Sheriff of a county serves as the jail administrator any time there is a not a person available who satisfies the examination requirements set forth in Tex. Gov't Code, § 511.00905 and "if there is a vacancy … the sheriff shall serve as administrator of the jail until a new administrator is appointed and assumes the position."[3]

10.     BEXAR COUNTY HOSPITAL DISTRICT d/b/a UNIVERSITY HEALTH SYSTEM ("UHS"), may be served with process by serving Dr. Dianna M. Burns-Banks (Secretary of the Board) at 1954 E. Houston, San Antonio, Texas, 78202. In addition, service of UHS may be effected by personal delivery.  UHS is a political subdivision of the state of Texas, and a public health system created in 1955 to provide medical care to the indigent of Bexar County.  The Texas Supreme Court has held that county hospital districts are political subdivisions of the State authorized by the Texas Legislature to "provide for the establishment of a hospital or hospital system to furnish medical aid and hospital care to indigent and needy persons residing in the district."[4]  The Adult Detention Center at issue states that primary care services are provided by UHS, including medical staff, on-site services, clinic, pharmacy, and in-patient care.[5]  Pursuant to this Court's holding in *Rodriguez v. Bexar Cnty.,* entities must be separated for purposes of determining liability:  "Bexar County and Bexar County Hospital District d/b/a University Health

---

[2] *See O'Donnell v. Harris County*, 892 F.3d 147, 157 (5th Cir. 2018).

[3] Tex. Local Gov't Code, § 351.034(d).

[4] *See Rodriguez v. Bexar Cnty*., Civil Action No. SA-18-CV-248-XR, 2018 U.S. Dist. LEXIS 157585 at *3 (W.D. Tex. Sept. 17, 2018) ("The Texas Supreme Court has held that county hospital districts are political subdivisions of the State authorized by the Texas Legislature to 'provide for the establishment of a hospital or hospital system to furnish medical aid and hospital care to indigent and needy persons residing in the district.'" (quoting *Klein v. Hernandez*, 315 S.W.3d 1, 7 (Tex. 2010) (quoting Tex. Health & Safety Code § 281.002(a)).

[5] https://www.bexar.org/737/Medical-Services (last visited 12.12.19).

System ("UHS") are distinct legal entities. Therefore, it must ultimately be determined which entity employed each individual Defendant."[6]

11.     Defendant San Antonio Police Department Officer JESSE SALDANA, Badge #0575, is named officially and may be served with process at 315 South Santa Rosa, San Antonio, Texas, 78207. Service of said Defendant as described above may be effected by personal delivery. At all times relevant to this cause, he was operating in the course and scope of his agency and/or employment relationship with the San Antonio Police Department/City of San Antonio.

12.     Defendant CITY OF SAN ANTONIO may be served with process by serving Leticia Vacek, City Clerk, at 114 W. Commerce, San Antonio, Texas, 78205. The Fifth Circuit has consistently held that municipal entities and local governing bodies do not enjoy immunity from suit, either absolute or qualified, under a civil action for deprivation of rights.[7]

13.     In anticipation of the potential argument by some of the Defendants listed above that they either are not the cause of Plaintiff's injuries or they are not the "policymaker" responsible for the creation or implementation of procedures and law relative to this case, Plaintiff respectfully directs the Court's attention not only to Fifth Circuit decisions, but also to U.S. Supreme Court decisions. The *Booth* court discusses in some detail that **plaintiffs need not establish proximate causation of their injuries, but rather, only "need only allege an injury that can be fairly traced to the actions of a particular defendant.**"[8] Regarding whether a particular Defendant is a policymaker for the purposes of establishing liability, Plaintiff urges the Court to look to Texas

---

[6] *Rodriguez v. Bexar Cnty.*, 2018 U.S. Dist. LEXIS 157585 at *3.
[7] *Burge v. Par. of St. Tammany*, 187 F.3d 452, 466-67 (5th Cir. 1999) citing *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 166, 122 L. Ed. 2d 517, 113 S. Ct. 1160 (1993).
[8] *Booth v. Galveston Cnty.*, No. 3:18-CV-00104, 2018 U.S. Dist. LEXIS 218967, at *20 (S.D. Tex. 2018) discussing *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547, 194 L. Ed. 2d 635 (2016), *League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*, 659 F.3d 421, 431 (5th Cir. 2011), and *Bennett v. Spear*, 520 U.S. 154, 168-69, 117 S. Ct. 1154, 137 L. Ed. 2d 281 (1997) (emphasis added).

statutory law and judicial opinions for holding municipalities liable.

14.     In addition to Plaintiffs' claims against named and unnamed Defendant Officers/Officials, Plaintiff sues BEXAR COUNTY and the CITY OF SAN ANTONIO. A city or county is liable for the actions of its employees because **the constitutional violations were caused by Bexar County's and the City of San Antonio's failure to follow clearly defined Texas laws and city policies**.[9]

15.     Defendants are not entitled to qualified immunity because, at the time of the multiple violations listed above, a reasonable Officer/Official with the same information could not have believed that Defendants' actions were lawful. **Law enforcement officers and government officials are presumed to know the clearly established constitutional rights of individuals they encounter**.[10] Defendants are liable as supervisors of individually named and unnamed employees, officers, supervisors, and contractors because Defendants' own conduct denied Plaintiff her constitutional rights.[11]

### III.     FACTUAL ALLEGATIONS

16.     On or about October 23, 2020, Heather discovered that her now ex-husband had been sexually assaulting her in her sleep for months.  Heather told her husband that she wanted a divorce, and he left their home that weekend.  Heather's husband has a history of alcohol abuse and previously had used a loaded gun to threaten suicide.

17.     When her husband returned, on or about October 25, 2020, Heather reiterated that she wanted a divorce.  The next day, October 26, her husband admitted himself to the VA hospital,

---

[9] *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002) (emphasis added).
[10] *Davis v. City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005) (emphasis added).
[11] *Id.*

6

because he was having suicidal ideations.  On or about October 27, 2020, Heather went to see her divorce attorney, Jay Petterson, Esq.  After consulting with Mr. Petterson, Heather immediately filed for divorce and contacted the police to make a report about the sexual assault by her husband. When Heather contacted the police, however, they refused to file a report, because the sexual assault did not involve penetration.

18.     In addition, at or around this time, Heather told her husband's social worker that her husband was not welcome in her home, because the VA intended to discharge him to her home. Heather did not feel safe therefore, she sold the gun that was at her house. She also stayed up overnight  and packed her husband's personal belongings.

19.     Heather and her mother, Kellye Forster ("Kellye"), secured a rental until on or about October 28, 2020, and engaged movers, who transported her husband's personal belongings to the storage unit.  Heather told her husband that he could pick up his belongings and storage key from her if the police were present for the exchange.  The former couple also exchanged text messages in which Heather's husband admitted to the sexual assault.  Heather provided the text messages to Mr. Petterson to obtain a protective order.  That night, Heather slept very little.

20.     The next day, October 29, 2020, Heather's husband contacted her around 2 p.m. to pick up his personal effects from the home.  Kellye was unavailable to accompany Heather so she agreed to meet her husband at the home without her mother present.  Heather's ex-husband arrived with the police at the home at approximately 3:30 p.m.  One of the officers present was Officer Jesse Saldana.  During the meeting, Heather was very upset and confronted her husband in front of the police.  That night, Heather slept very little.

21.     On October 31, 2020, Heather had been unable to sleep for several days, due to her husband's erratic behavior, the stress of dealing her husband's sexual assault, and memories of

childhood trauma.  She was experiencing audio disturbances and her sense of smell became hyper acute.

22.     Later in the day, on October 31, 2020, Heather0Heather started to clean the house and  remove items that her husband had given her.  Kellye advised Heather to go upstairs and try to sleep.  While Heather tried to sleep, Kellye accidentally started a grease fire while cooking French fries.  Kellye had to call 911 for the fire emergency, and ultimately the stove had to be removed from the home.  Heather did not smell the smoke or hear the commotion when it was happening.

23.     On November 3, 2020 (per Police Report) or October 31, 2020, Heather experienced a mental health crisis during which she grabbed Kellye's arms and pulled Kellye to her chest, which knocked off Kellye's glasses and scared her.  Kellye called the police and said Heather had tried to break her arm and hit her.  Police were dispatched to the home for a "mental health disturbance in progress" by a caller who stated that "a female is having a mental breakdown."  Heather then went outside and kicked over a table belonging to her neighbor in the adjoining duplex.  In Heather's mind, she believed the neighbor had invited her husband over to drink and were laughing at Heather.  This was not reality.  Kellye called for an ambulance and asked for the police to assist with placing Heather in the ambulance.  Heather's neighbor pushed her to the ground to protect himself and his family.  Another neighbor came outside and exclaimed, "I'm going to handle this shit."  Heather attempted to pick herself off the ground so she could go back into her house and continue cleaning.  As Heather attempted to get up, the second neighbor pushed her back to the ground, laid on top of her, and threatened to shoot her in the face.  Heather screamed at the second neighbor, said "father," and then he let Heather go.  Heather went inside the house.

8

Police arrived at the home, including Officer Jesse Saldana, Officer J. Diaz (Badge #844), and their supervisor, T. Wyant (Badge #3144). Officer Saldana, Officer Diaz and Supervisor Wyant all interacted with Plaintiff and observed the mental health crisis that was exhibited by her incoherent and erratic behavior.

24.     Officer Saldana spoke with Kellye while his colleague, Officer Diaz, went inside the house.  Kellye told Officer Saldana that Heather was bipolar, recently has been sexually assaulted, and was experiencing a mental crisis.  Kellye also told Officer Saldana that she did not know whether Heather had been taking her medication.

25.     In his Report, Officer Saldana states:

> I made the location and observed the entire driveway full of items that were thrown around and broken. I could hear S-1 [Heather] screaming at my cover officer, J. Diaz# 844, in the kitchen. I walked through the garage and into the kitchen, where I attempted to de-escalate S-1 [Heather]. S-1 [Heather] was very agitated, and she would calm down then all of a sudden start screaming again. There were times where she would scream so loud and talk fast I could not understand what she was saying.  I had contact with S-1 [Heather] the week prior.  S-1 [Heather] stated to me she is diagnosed with Bipolar and other mental illnesses. It is unclear if S-1 [Heather] is taking her medications.

26.     Officer Saldana documented that Kellye did not want to go to the hospital and that she was bruised.  Officer Saldana could hear Heather screaming at Officer Diaz inside the house. Heather wanted them to leave her alone so she could continue cleaning.  Heather showed the officers around her home, so they knew she was unarmed. Nevertheless, Officer Saldana decided to arrest Heather, because Kellye is a senior, 65 years old.  Kellye begged Officer Saldana to send Heather to the hospital instead of jail.  Officer Saldana told Kellye that the medical facility at Bexar County would treat Heather following her arrest.

27.     The officers forcibly turned Heather around to place her in handcuffs and leg

9

shackles. Heather struggled against the restraints and worked herself into a sitting position. Heather passively resisted the officers by remaining sitting. The officers dragged Heather from the home and down the driveway to a vehicle. She was transported to Bexar County to be booked for injury to an elderly person-BI/F3, Texas Penal Code §22.04(a), and assault contact non-family MC, Texas Penal Code §22.01(a)(3).

28.     Upon arrival at Bexar County, the officers dragged Heather out of the vehicle, causing her to strike her head. Officers then forcibly placed Heather in a restraint chair. Heather struggled against the bonds and was cursing. The arresting officers reported that Heather was suicidal.

29.     On or about November 2020, Heather was taken before the magistrate judge via video. During her appearance, Heather continued to curse vehemently and struggle against her restraints. After her appearance before the magistrate, Heather was taken to booking. Heather was forced forward in her restraints and the deputies pushed her back so hard that she urinated. Her handcuffs were fastened so tightly that it broke the skin on her wrists and ankles. The deputies took Heather to a private room in the booking area. Heather tried to tell the deputies that her handcuffs were too tight and that she was losing sensation in her writs. The deputies saw Heather but ignored her. When a deputy wanted to take Heather's fingerprints, Heather told him the handcuffs were too tight. The deputy started to remove Heather's handcuffs and her hands were swollen with venous congestion and her right wrist was lacerated. Heather refused to give fingerprints until an attorney saw her and photographed her wrists and arms. A nurse came to see Heather because of the laceration and the bruises all over her body. During this time, Heather continued to act irrationally which demonstrated her obvious psychological impairment.

30.     After approximately 30 minutes, three deputies came in and forcibly removed

Heather from the private room to give fingerprints.  Heather yelled at the deputies and took off her clothes.  The deputies then returned in full SWAT gear, and Heather was holding a pole in the middle of the room while laying on the ground.  One of the deputies tasered Heather.  Heather pulled the taser's barbs from her right thigh, then cursed and bit the deputy on his ankle through his sock.  The deputies dragged Heather from the room and, with the help of three other deputies, forced Heather into a restraint chair and placed a bite guard on her.  Heather continued cursing and fighting against her bonds.  One of the younger deputies approached Heather calmly and told her that he was going to pick up her hand.  Heather consented, immediately calmed down, and permitted the deputy to take her fingerprints.  The deputies took pictures and moved Heather forward and around by holding her restraints and forcing her forward on her lacerations and bruises.

31.     Heather had been given a gown that did not have ties, so she was covered, and one deputy took her to University Hospital to get blood drawn. The nurse present upon Heather's arrival knew that Heather was psychotic.  Heather agreed to take a tablet of Zyprexa, and then slept for the first time in several days.

32.     On or about November 2020, Heather appeared before a magistrate judge via video for biting the deputy's ankle.  Heather requested a court appointed attorney.  Heather then returned to her cell.  Heather was not taken to the medical ward or infirmary during these days.  The nursing staff were aware of Heather's mental disturbance and knew she was acutely ill with mania and psychosis.  Heather did see two registered nurses briefly.  Heather was kept in a room that was foul smelling and had a sewer leak.  After the sewer leak, Heather was moved down the hall into another small holding cell without a toilet.

33.     Heather felt the urge to have a bowel movement and knew that she had diarrhea.

She banged on the door to get the deputies' attention.  The deputies saw Heather but ignored her.

Heather then passed liquid stool and was given no opportunity to clean herself before deputies

took her to the detention center to be monitored for suicide ideation.  Still, Heather was not taken

to the infirmary, but rather kept in a cell for "suicide watch" with another inmate.  Heather's gown

was removed, and she was given a paper gown, which promptly ripped.  Heather used the torn

paper gown and scraps of soap given to her by other inmates to try and clean her legs and the mess

she had made in the room.  The other inmate was disgusted by Heather but was able to take a

shower.  Heather asked for another paper gown, toilet paper, and a sanitizer so she could clean

their plastic mattresses and the floor.  Heather then slept nude on the floor after cleaning the room.

34.     On  or about November _____, 2020, medical personnel came by and asked

Heather if she were suicidal, to which she answered "no."  Yet the medical personnel could see

that Heather was bruised all over her body, and that she was psychotic.  Heather was moved to

another room and kept in solitary confinement.

35.     The next few days are a blur. Heather was visited by multiple medical staff who

gave her a Covid test and chest x-ray.  They also had a list of Heather's mediations, because her

personal psychiatrist had faxed them a copy.  Heather did not regularly receive her medications.

Heather recalls receiving the medication only one time, because the deputy mocked her and called

her "disgusting."  Heather remained nude during this time, except for the occasion when she had

to walk to get an x-ray and was given clothes to wear.  After seeing Heather's x-ray, the doctor

was concerned about congestion visible on the x-ray and wanted to listen to Heather's lungs.

Heather refused to eat, because the smell of food was appalling to her.  Heather had no toilet paper

during this time.  The wounds on her wrist started to become infected and her right hand swelled

greatly  (see photos). Pus leaked from both of Heather's wrists, and she had red streaks up her

arms. Heather also was febrile. Heather recalls being sick and losing control of her bowels, and one time her room was cleaned by housekeepers. She heard one of the housekeepers say "Look at her hand."

36. On November 11, 2020, Heather was taken to the infirmary and medical part of Bexar County Detention. Heather was seen in the infirmary, and the room in which they placed her had a drawer where she could reach through if the deputies opened it. The deputies wanted Heather to take medication for her psychosis, and she reached through the drawer to take the pills. At this point, the deputies noticed Heather's hand. While in solitary confinement, Heather's hand hurt so badly that she would scream at night. The hand obviously was infected; one could see redness, streaks up Heather's arm, pus, and significant swelling. The deputies in the infirmary clearly had not been told about Heather's infected hand and contacted the nurse practitioner to examine the hand. The nurse practitioner examined Heather's hand and said that she needed to go to the hospital due to a bad case of cellulitis. Heather was once again handcuffed, placed in shackles, and transported to the hospital. At the hospital, Heather was able to walk inside, but she was notably febrile. The nurses were shocked at the extent of her infection. Heather was taken to a holding area on a stretcher until a room was ready for her. The nurses administered three different IV antibiotics and started IV fluids to treat Heather for sepsis. The next day, Heather was taken to a room and allowed to shower.

37. On November 12, 2020, psychiatry finally saw Heather and determined that she was severely manic and psychotic. The doctors faxed a letter to the district attorney and to the prosecutor's office saying that Heather required a competency hearing and was unable to comprehend what was happening to her. At this time, Heather continued to hear and smell things very acutely and was unconnected to reality. The doctors started Heather on Lithium at 600 mb

BID, because it was the medication the jail had.  Heather also was given Zyprexa so she could sleep.

38.     Over the next few days, Heather continued to receive IV antibiotics and large amounts of IV fluids to combat her infection.  She began to improve psychologically, because the medications finally enabled her  to sleep.  The doctors told Heather that they were concerned that she might have fractures in her wrists, but ultimately it was determined it to be a severe infection and that Heather did not require surgery.

39.     On November 17, 2020, Heather was moved to oral antibiotics and medical personnel made the determination to send her back to Bexar County Detention Center.  Heather then was taken back to general holding.  Some of the women remembered Heather from when she previously had been released from solitary confinement to general holding while she had been psychotic and sick with infection.  Heather, however, had no memory of this.  Heather continued on antibiotics for two weeks.  She also was given lithium and Zyprexa, but she was not eating or drinking.  Heather told the nurses who came to dispense her medication that she was falling against things, had blurred vision, and was unable to stand.  Heather said she needed to stop taking the lithium, because she was getting lithium toxic.  She then developed diarrhea, which is a late side effect of lithium toxicity.

40.     On December 5, 2020, Heather was taken to the infirmary.  The nurse who saw her witnessed Heather struggling to stand and walk.  The nurse also saw Heather's uncontrollable diarrhea.  Yet, medical staff failed to realize that Heather was acutely ill due to Lithium toxicity.  The medical staff did not send Heather to the hospital.

41.     On December 6, 2020, Heather could no longer stand or walk.  She stayed on the floor of her cell in the infirmary.  Heather recalls that some deputies came into her cell and told

14

her to stand up.  Heather said she could not stand, because she was unable to voluntarily move her muscles.  Someone then came in and forced Heather to her feet.  At this point, Heather suffered a seizure. This is the last point Heather recalls until she woke up in the ICU at University Hospital. Heather was unaware that she had been in a coma, had dialysis, and had encephalitis.

42.     Heather's uncle spoke with the district attorney and the deputy dropped his charges. In addition, the case regarding Heather's interaction with her mother on November 3 also had been dropped.  Because Heather was no longer incarcerated, she was moved onto a medical unit without a deputy.

43.     On December 22, 2020, Heather was discharged from the hospital to rehabilitation. Heather's initial evaluation, conducted by Kathryn Markarevich NP, stated that Heather's chief complaint was weakness.  Ms. Markarevich noted Heather had a preexisting medical history of bipolar disorder and hypothyroidism and was brought to University hospital after having a tonic clonic seizure (aka grand mal seizure) at the jail.  On admission, Heather's lithium level was >3, WBC 26, creatinine 2.2, and lactic acid 4.  She was given Rocephin, zosyn, and vanco and her UA and blood cultures obtained.  CT scan was negative and chest xray cultures were negative.  Urine testing revealed cannabinoids.  A trialysis catheter was placed and she underwent multiple dialysis sessions.  Heather also suffered from insomnia.  Prior to her UHS admission, Heather was independent with activities of daily living, ambulation, and able to drive herself.  Heather suffered a decline in her functional status and required aggressive PT/OT to regain her strength.  Heather was admitted to rehabilitation for ongoing medical management and aggressive PT/OT therapy.

44.     On December 23, 2020, Barry T. Hill, M.D., evaluated Heather.   Dr. Hill noted that Heather had been admitted for ongoing medical care and an intensive course of comprehensive rehabilitation therapies to help Heather recover after functional decline due to metabolic

encephalopathy.  Heather presented at the emergency department with altered mental state after witnesses observed her suffer tonic clonic seizures.  Heather was admitted to UHS on December 6 with acute encephalopathy secondary to lithium toxicity.  After presentation to the emergency department, leukocytosis, hypercalcemia, lactic acidosis, and lithium level was >3.  Heather received broad-spectrum IV antibiotics, a CT scan was unremarkable for acute intracranial abnormality, lumbar puncture negative for meningitis, blood cultures negative.  Heather required multiple dialysis sessions.  Trileptal and Keppra were administered for management of seizures, Zyprexa stopped, and Seroquel started for bipolar disorder.  Heather's mentation started improving on December 22, and she was ready to start intensive rehabilitation therapies to facilitate her functional recovery.  Dr. Hill noted that Heather had mild difficulty ambulating and performing self-care tasks.  Dr. Hill also noted that Heather did not take lithium at home; lithium was started at the jail.

45.     Dr. Hill concluded that Heather had functional decline from her prior status after metabolic encephalopathy secondary to lithium toxicity.  Heather's medical condition required ongoing monitoring of wounds to optimize her clinical recovery and clinical ability to participate with intensive therapies.  Heather was at risk for complications, such as fall risk, hemodynamic liability, respiratory distress, change in mental status, electrolyte derangements, seizures, and hemorrhage.  Dr. Hill found Heather currently was able to participate with three hours of daily therapies at least 5 days per week for a total of 15 hours of weekly therapy.

46.     Dr. Hill concluded that Heather would benefit from a course of intensive therapies from the multidisciplinary rehabilitation team and be able to return home and resume her previous living arrangements.  Heather would require physical therapy to optimize gait, transfers, dynamic balance, lower body strength and endurance for improved functional independence with mobility.

16

In addition, Heather required occupational therapy for upper body strengthening, energy conservation skills, adaptive technique, and optimized functional independence with the activities of daily living.  Both physical and occupational therapy would provide Heather with a home exercise program. A case manager would be involved in Heather's care and assist with acquisition of necessary durable medical equipment and ensure safe discharge disposition.

47.     Dr. Hill also concluded that Heather should have speech therapy for cognitive evaluation and cognitive therapy as clinically indicated to optimize functional cognitive skills.  In addition, rehabilitation nursing would be available to Heather 24 hours a day and would be responsible for assistance with bowel and bladder management, skin monitoring, and medication administration.  Heather's rehabilitation goals were to achieve independence with mobility and the activities of daily living.  Dr. Hill estimated Heather's rehabilitation stay would extend for 5 to 7 days.

48.     Heather was discharged just three days later on December 26, 2020.  According to her discharge summary, written by Ms. Markarevich, Heather's mentation had improved.  Heather was restarted on estradiol, a female hormone replacement, which she previously had taken at home. Heather also received thyroid medication for her hypothyroidism.  In addition, Heather underwent multiple dialysis before her trialysis catheter was removed.  During rehabilitation, Heather's renal function was monitored, no seizures reported, and she continued to receive Seroquel to address her bipolar disorder.  Heather's insomnia was treated with melatonin, which reportedly improved her insomnia. Heather received aggressive PT/OT for her functional declines and made improvements sufficient to be discharged home with family care.  Heather was instructed to follow up with her primary care physician in one to two weeks and specialists as directed.

49.     On January 1, 2017, Defendant Sheriff JAVIER SALAZAR was sworn into office.

Prior to being elected Sheriff, Defendant Sheriff JAVIER SALAZAR served with the San Antonio Police Department for twenty-three (23) years, most recently as their public information officer.

50.     On July 24, 2017, seven (7) months after assuming his role as sheriff and more than three years before Heather was arrested, Defendant Sheriff JAVIER SALAZAR received written notice from the Texas Commission on Jail Standards outlining the requirements sheriffs must follow to comply with the newly enacted S.B. 1849 ("The Sandra Bland Act"). S.B. 1849 amended Tex. Code Crim. Proc. Art. 16.22 and required compliance by specific dates in 2018.

51.     The 85th Legislature, amended Acts 2017, chapter 748 and chapter 950 (S.B. 1849) relative to the Tex. Code Crim. Proc. Art. 17.032 – "Release on personal bond of certain defendants with mental illness or intellectual disability." These changes directly illustrate the pretrial recommendations and magistration process of mentally ill defendants.

52.     The Texas Commission on Jail Standards, through the Tex. Admin. Code, dictates the health services required for all Texas jails. Section 273.5 outlines the responsibilities and requirements of each sheriff/operator in coordination with mental health officials for developing and implementing a mental disabilities/suicide prevention plan, including:  training, identification, reviewing, screening, communication, housing, supervision, intervention and emergency treatment, and checking the mental health history and background of all inmates admitted.[12]

53.     By law, Defendants were required to "give prisoners the ability to access a mental health professional at the jail through a telemental health service 24 hours a day" and "give prisoners the ability to access a health professional at the jail or through a telehealth service 24 hours-a-day or, if a health professional is unavailable at the jail or through a telehealth service,

_____

[12] 37 Tex. Admin. Code § 273.5

18

provide for a prisoner to be transported to access a health professional."[13]

54.     Defendant BEXAR COUNTY HOSPITAL DISTRICT D/B/A UNIVERSITY HEALTH SYSTEMS ["UHS"] is responsible for the medical treatment of all inmates at the Bexar County Jail and provided medical and mental health care to Heather while she was incarcerated.

55.     From November 3, 2020, until approximately December 22, 2020, Defendants BEXAR COUNTY, Sheriff JAVIER SALAZAR, and UHS failed to keep Heather safe and free from physical and psychological injury and harm.

## IV.     CLAIMS

**COUNT I - VIOLATIONS OF 42 U.S.C. § 1983 FOR DEPRIVATION OF CIVIL RIGHTS UNDER THE DUE PROCESS AND EQUAL PROTECTION CLAUSES OF THE FOURTEENTH AMENDMENT AS TO DEFENDANTS BEXAR COUNTY AND SHERIFF SALAZAR**

56.     Plaintiff reincorporates preceding paragraphs 1-57 as if stated fully herein.

57.     As a direct and proximate result of the foregoing facts, Defendants BEXAR COUNTY and SHERIFF JAVIER SALAZAR contrary to law and unreasonably deprived Heather of her privileges and immunities guaranteed by the Due Process and Equal Protection Clauses under the Fourteenth Amendment, as well as his rights under the Texas Constitution, in a willful and wanton fashion, and they were deliberately indifferent. Because of their indifference, they caused Heather to suffer immeasurable injury and suffering, which caused the general damages requested by Plaintiff in an amount to be proven at trial.

58.     Under 42 U.S.C. § 1983, "every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, *subjects, or causes to be subjected*, any citizen of the United States or other person within the jurisdiction

---

[13] Tex. Gov't Code § 511.009(a)(23)(A-B)

thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, **shall be liable to the party injured** in an action at law, suit in equity, or other proper proceeding for redress."

59.     The Fifth Circuit has explained that deliberate indifference means that "**it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights**." *Rhyne v. Henderson Cnty*., 973 F.2d 386, 392 (5th Cir. 1992) (emphasis added).  Plaintiff asserts that all Defendants deliberately ignored existing policies or they did not adopt policies required by Texas law to protect Heather while she was incarcerated in the Bexar County Jail, thereby creating *de facto* policies through customs of ignoring the law.  Defendants' deliberate indifference to the serious medical needs of its detainees in the jail, like Heather, caused her to needlessly suffer. The Fifth Circuit has consistently held that **municipal entities and local governing bodies do not enjoy immunity from suit, either absolute or qualified, under a civil action for deprivation of rights.**[14]

## COUNT II – UNCONSTITUTIONAL CONDITIONS OF CONFINEMENT PURSUANT TO 42 U.S.C. § 1983 AS TO ALL DEFENDANTS

60.     Plaintiff reincorporates preceding paragraphs 1-57  as if stated fully herein.

61.     This Court discussed at length the bifurcation of constitutional claims for pretrial detainees in *Rodriguez v. Bexar Cnty*.[15] "Courts considering constitutional challenges by pretrial detainees must begin by deciding whether to classify the challenge as an attack on a condition of confinement or an episodic act or omission."[16]

---

[14] *Burge v. Par. of St. Tammany*, 187 F.3d 452, 466-67 (5th Cir. 1999) citing *Leathimman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 166, 122 L. Ed. 2d 517, 113 S. Ct. 1160 (1993) (emphasis added).
[15] *Rodriguez v. Bexar Cnty.*, 2018 U.S. Dist. LEXIS 157585 at *3 (citing *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 526 (5th Cir. 1999)).
[16] *Id*.

62.     This Court explained in the *Rodriguez* opinion that a "challenge to a condition of confinement" is "a challenge to general conditions, practices, rules, or restrictions of pretrial confinement, and the constitutional issue is whether the condition is reasonably related to a legitimate governmental objective."[17] Additionally, *Rodriguez* clarifies that "a plaintiff may assert a conditions-of-confinement claim based on injuries suffered as a result of not receiving proper medical attention if the plaintiff does not implicate the acts or omissions of individuals but rather the jail's system of providing medical care to inmates."[18]

## A.   DEFENDANTS BEXAR COUNTY, SHERIFF SALAZAR, and UHS, VIOLATED PLAINTIFF'S FOURTEENTH AMENDMENT *RIGHT TO MEDICAL CARE* WHILE SHE WAS DETAINED AT BEXAR COUNTY JAIL.

63.     "When a county takes custody of a prisoner, *it must provide health care for the prisoner,*" per TEX. CODE CRIM. P. art. 16.21; *see also* 37 TEX. ADMIN. CODE § 273 (Texas Commission on Jail Standards, Health Services).[19] The United States Supreme Court has held that a governmental entity's duty to provide medical care to inmates is constitutionally mandated. *West v. Atkins*, 487 U.S. 42, 56, 108 S. Ct. 2250, 2259, 101 L. Ed. 2d 40 (1988).[20]

64.     A pretrial detainee who has not been convicted of a crime has a right under the Fourteenth Amendment to the United States Constitution to be protected from impermissible punishment, like the denial of or delay in providing necessary medical care. According to the *Fifth Circuit Pattern Jury Charges*, Plaintiff must prove the constitutional violation occurred due to the existence of an identifiable or intended condition, policy, or practice of inadequate medical care

---

[17] *Id.* (discussing *Estate of Henson v. Wichita Cnty.*, Tex., 795 F.3d 456, 462 (5th Cir. 2015)).
[18] *Id.* (discussing *Estate of Henson v. Wichita Cnty.*, 795 F.3d at 463). *See also Montano v. Orange County*, 842 F.3d 865 (5th Cir. 2016).
[19] *Thomas v. Harris County*, 30 S.W.3d 51, 57 (Tex. App.—Houston [1st Dist.] 2000) (emphasis added).
[20] *Id. (*discussing *West v. Atkins*, 487 U.S. 42, 56, 108 S. Ct. 2250, 2259, 101 L. Ed. 2d 40 (1988)).

and that the condition, policy, or practice was not reasonably related to a legitimate governmental objective.[21]

65.     The Fifth Circuit recognizes that a condition usually results from an explicit policy or restriction, but a pattern may demonstrate an unstated or *de facto* policy.[22] This Court supported this in the *Rodriguez* opinion in that "[i]n some cases, a condition may reflect an unstated or *de facto* policy, as evidenced by a pattern of acts or omissions **sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by [jail] officials, to prove an intended condition or practice**."[23]

66.     Here, Heather was arrested at her home while experiencing a mental health crisis. Heather had a history of bipolar disorder.  Defendants were aware of Heather's bipolar disorder. While in Defendants' care, Heather improperly was given lithium, which led to lithium toxicity. Due to the lithium toxicity, Heather suffered terribly both mentally and physically.  Heather had encephalitis, was in a coma for several days, and received multiple dialysis treatments.  As a result, Heather also suffered a decline in her functional status and required aggressive PT/OT to regain her strength.  Heather was admitted to rehabilitation for ongoing medical management and aggressive PT/OT therapy.  During her hospitalization, the criminal charges against Heather were dropped.  Following rehabilitation, Heather was discharged to her home and family care.

67.     The indifference shown by failing to treat Heather, improperly medicating Heather, and failing to have Heather transferred to a less restrictive environment which could more

---

[21] *PATTERN JURY INSTRUCTIONS (Civil Cases)* Prepared by the Committee on Pattern Jury Instructions District Judges Association Fifth Circuit 2014 with revisions through October 2016 citing *Shepherd v. Dallas County*, 591 F.3d 445, 455 (5th Cir. 2009) (approving jury charge).
[22] *Id.*
[23] *Rodriguez v. Bexar Cnty.*, 2018 U.S. Dist. LEXIS 157585 at *5 (citing *Shepherd*, 591 F.3d at 452) (emphasis added).

adequately address her mental health needs is evidence in itself that the level of medical care provided generally by UHS Correctional Health Care Services at the Bexar County Jail was so inadequate that it resulted in a serious deprivation of Plaintiff's basic human needs, and that the lack of care provided was not reasonably related to a legitimate governmental objective.[24]

68.     The Fifth Circuit recites in its *Pattern Jury Charges* that "pretrial detainees may not be entitled to the best medical care available or to the level of medical care that may be available to persons who are not detained or incarcerated, but a **facility must provide for a detainee's basic human needs**."[25] In a general context, "basic human needs" could be understood as food and shelter, but as discussed herein, Texas law clearly required Defendants to provide Plaintiff with much more care. Defendants Bexar County, Sheriff Salazar, and UHS failed to meet a basic duty to provide him "basic human needs" because they ignored Plaintiff's mental health status and failed to provide adequate treatment for her mental or physical health concerns. The Fifth Circuit has consistently held that **municipal entities and local governing bodies do not enjoy immunity from suit, either absolute or qualified, under a civil action for deprivation of rights.**[26]

## B.   DEFENDANTS BEXAR COUNTY, SHERIFF SALAZAR, AND UHS, VIOLATED PLAINTIFF'S *FUNDAMENTAL CONSTITUTIONAL RIGHT TO BE PROTECTED FROM CRUEL AND UNUSUAL PUNISHMENT.*

69.     The Due Process Clause accords pretrial detainees rights not enjoyed by convicted

---

[24] *Shepherd*, 591 F.3d at 455; *see also Shepherd*, 591 F.3d at 452 (citing *Bell v. Wolfish*, 441 U.S. 520, 539 (1979)).

[25] *PATTERN JURY INSTRUCTIONS (Civil Cases)* Prepared by the Committee on Pattern Jury Instructions District Judges Association Fifth Circuit 2014 with revisions through October 2016 citing *Shepherd v. Dallas County*, 591 F.3d at 453-54 (emphasis added).

[26] *Burge v. Par. of St. Tammany*, 187 F.3d 452, 466-67 (5th Cir. 1999) (citing *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 166, 122 L. Ed. 2d 517, 113 S. Ct. 1160 (1993) (emphasis added)).

inmates under the Eighth Amendment to the United States Constitution prohibition against cruel and unusual punishment.[27] A **pretrial detainee is entitled to greater rights** than those afforded convicted prisoners.[28] Specifically, "although convicted prisoners have only an Eighth Amendment right to be free from 'cruel and unusual' punishment, a pretrial detainee has a Fourteenth Amendment Due Process **right to be free from any type of punishment.**"[29] Thus, the inadequate medical care of pretrial detainees falls within the broad scope of reasonable medical care and is actionable under 42 U.S.C.S. § 1983.[30]  In *West*, a case involving civil liability under 42 U.S.C. § 1983, the Supreme Court interpreted the Cruel and Unusual Punishment Clause of the Eighth Amendment to impose a duty on prisons to provide medical care for inmates.[31]

70.    These elementary principles establish the government's obligation to provide medical care for those persons it is punishing by incarceration.[32] An inmate must rely on prison authorities to treat her medical needs; if the authorities fail to do so, those needs will not be met.[33] "In the worst cases, such a failure may actually produce physical 'torture or a lingering death,' *in re Kemmler*, *supra*, the evils of most immediate concern to the drafters of the Amendment."[34] "In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose."[35] The infliction of such unnecessary suffering is

---

[27] *Colle v. Brazos Cnty.*, 981 F.2d 237, 239 (5th Cir. 1993).
[28] *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979) (emphasis added).
[29] *Simmons v. Hays Cnty. Sheriff's Dep't*, No. A-11-CV-343-LY, 2012 U.S. Dist. LEXIS 200021, at *20 (W.D. Tex. Sept. 21, 2012); *Colle v. Brazos Cnty.*, 981 F.2d 237, 244 (5th Cir. 1993) ("A pretrial detainee . . . has a **Fourteenth Amendment Due Process right to be free from punishment altogether**.") (emphasis added)).
[30] *Id.*
[31] *West v. Atkins*, 487 U.S. 42, 56, 108 S. Ct. 2250, 2259, 101 L. Ed. 2d 40 (1988).
[32] *PATTERN JURY INSTRUCTIONS (Civil Cases)* Prepared by the Committee on Pattern Jury Instructions District Judges Association Fifth Circuit 2014 with revisions through October 2016.
[33] *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S. Ct. 285, 290 (1976).
[34] *Id.* at 290.
[35] *Id.* Cf. *Gregg v. Georgia*, *supra*, at 182-183 (joint opinion).

inconsistent with the standards of decency expressed in modern legislation that "**it is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself.**"[36]

71.     The pain and suffering endured by Plaintiff through her incarceration amounted to extremely cruel and unusual punishment prohibited under the Fourteenth Amendment, thus violating 42 U.S.C. § 1983.

72.     The indifference shown by failing to treat Heather, improperly medicating Heather, and failing to have Heather transferred to a less restrictive environment which could more adequately address her mental health needs is evidence in itself that the level of medical care provided by UHS Correctional Health Care Services was so inadequate that it resulted in a serious deprivation of Plaintiff's constitutional human rights and amounted to cruel and unusual punishment prohibited under the Eighth and Fourteenth Amendments.

**C.  MULTIPLE FAILURES BY DEFENDANTS BEXAR COUNTY, SHERIFF JAVIER SALAZAR, AND UHS, TO MAINTAIN MINIMUM STANDARDS, ALONG WITH THE EVIDENCE OF INTENTIONAL NONCOMPLIANCE, DEMONSTRATE A PERVASIVE PATTERN AND PRACTICE OF *DERELICTION OF DUTY TO PROTECT AND KEEP DETAINEES SAFE* DURING THEIR INCARCERATION.**

73.     Under the conditions-of-confinement prong of the 42 U.S.C. § 1983 claim, Plaintiff claims the Defendants Bexar County, Sheriff Salazar, and UHS, by and through their employees and contractors, have a documented pattern and practice of noncompliance, thereby creating *de facto* policies of improperly protecting and caring for inmates with mental health issues putting them at substantial risk of serious harm. Under Tex. Code Crim. Proc. Art. 16.21, "**every sheriff shall keep safely a person committed to his custody.**" Had Defendants followed documented

---

[36] *Id.* at 290-91 (emphasis added).

policies and procedures under state and local law, Plaintiff would have been treated substantially differently, would have received the proper mental and physical care to which she was constitutionally entitled, and likely would not have suffered lithium toxicity, which caused encephalitis, put Heather in a coma for several days, and required multiple dialysis treatments and then aggressive PT/OT to regain her strength and functional capabilities.

74.     Incredibly, all of the mistreatment and suffering leading to Heather's death began, because her family called police for help when Heather was experiencing a mental health crisis. Defendants were aware of Heather's bipolar disorder.  It is inexplicable that Heather was arrested, and incarcerated in the Adult Detention Center, rather than Emergency Mental Health Detention.

75.     Furthermore, from January 19, 2018 through February 22, 2019, Bexar County Jail had five (5) deaths, one (1) suicide, and four (4) escapes in a twelve (12) month inspection period. *See* Exhibit XX. These statistics, along with the death of Heather Michael Forster in April 2019, support the claim that Defendants Bexar County and Sheriff Salazar have failed to follow Tex. Code Crim. Proc. Art. 16.21, specifying that "**every sheriff shall keep safely a person committed to his custody**."

76.     In addition, between December 14, 2018, through August 5, 2019, the Bexar County Jail had nine (9) deaths, which further supports the claim that Defendants Bexar County and Sheriff Salazar have failed to follow Tex. Code Crim. Proc. Art. 16.21, specifying that "**every sheriff shall keep safely a person committed to his custody**."

| INMATE  DEATHS | |
| --- | --- |
| Name and Age | Date of Death |
| Enrique Perez, 25 | Aug. 5, 2019 |
| Ashanti Taylor, 19 | Aug. 2, 2019 |

| | |
|---|---|
| Leon Causey, 24 | July 18, 2019 |
| Alexander Wise, 29 | May 30, 2019 |
| Jack Ule, 63 | April 8, 2019 |
| Jarnell Kimble, 45 | March 29, 2019 |
| Joshua Miranda, 19 | Jan. 11, 2019 |
| Fernando Macias, 61 | Dec. 16, 2018 |
| Janice Dotson-Stephens, 61 | Dec. 14, 2018 |

Source:  Bexar County Sheriff.[37]

77.     Statutory violations by Defendants Bexar County, Sheriff Salazar, and UHS, and supporting this claim include but are not limited to:

- Art. 16.21 of the Tex. Code Crim. Proc., "**every sheriff shall keep safely a person committed to his custody**;"

- Art. 16.22 of the Texas Code of Criminal Procedure, for "Early Identification of Defendant Suspected Having Mental Illness or Intellectual Disability" by failing to follow the mandatory procedures for magistration timeframes, prisoner access to mental health professionals, continuity of prescription medication requirements, mandatory training, and reporting requirements for mentally ill defendants ("**Not later than 12 hours after the sheriff or municipal jailer having custody of a defendant … reasonable cause to believe that the defendant has a mental illness or is a person with intellectual disability, the sheriff or municipal jailer shall provide written or electronic notice to the magistrate**." Art. 16.22(a)(3) – magistrate was required to order Dotson to submit to an examination within "**a reasonable period not to exceed 72 hours**");[38]

- Art. 16.23 of the Tex. Code Crim. Proc., "Diversion of Persons Suffering Mental Health Crisis or Substance Abuse Issue" by **failing to make a good faith effort to divert** Plaintiff Heather Forster to a proper treatment center in the agency's jurisdiction **as required**;

- Tex. Local Gov't Code § 353.034, "County Jail Facilities" by **failing to provide**

---

[37] The Rivard Report, "Deaths in Bexar County Jail Raise Questions About Facility's Operations" (Aug. 12, 2019) at https://therivardreport.com/another-death-in-bexar-county-jail-raises-questions-about-jail-operations/ (last visited 12.12.19)
[38] Tex. Code Crim. Proc. Art. 16.22(a)(1) (emphasis added).

**adequate safety** of Plaintiff Heather Forster **nor providing proper supervision and control over the jail** as required under § 351.041;

- Texas Senate Bill 1326 (effective September 1, 2017), "Reporting Requirements" by **failing to follow procedures regarding criminal defendants who are or may be persons with a mental illness or an intellectual disability** and by not obtaining a written assessment ordered by the magistrate and completed by the local MH/IDD authority or another qualified expert; and

- Defendants **failed to meet minimum statutory standards required** by the Texas Commission on Jail Standards and were cited for multiple violations of Tex. Admin. Code, Title 37.

78.     As of February 22, 2019, the Bexar County Jail was listed on the Texas Commission on Jail Standards website as having been found in noncompliance with Texas Minimum Jail Standards as codified in the Texas Administrative Code, Title 37, Part 9.  Counties are listed upon verification that the county has received the official notice of noncompliance, and counties are removed immediately upon attaining compliance.

79.     Additionally and specifically, the "Annual Report" for calendar year 2018 found **multiple deficiencies** and Defendants were advised to "promptly initiate and complete appropriate corrective measures." These deficiencies included, but were not limited to, findings such as:

- "Inmate classification paperwork and staff interviews indicated that jail staff routinely exceed custody reassessments are required. One file exceeded the 90-day limit by 27 days."[39]

- "The administration has **employed and authorized civilian employees to perform duties of health personnel or trained book in officers which is a violation of minimum jail standards.**"[40]

- "Observation logs indicated that jail staff exceeded the required face-to-face 15-minute observations **on a continual basis** in accordance with the jails [sic] own approved operational plan."[41]

- "Observation logs indicated that jail staff exceeded the required face-to-face 60-minute observations **on a continual basis** by as few as 1 minute up to 126

---

[39] 37 Tex. Admin. Code § 267.1(b)(3).
[40] 37 Tex. Admin. Code § 273.4(a) (emphasis added).
[41] 37 Tex. Admin. Code § 273.5(a)(5)

minutes."[42]

- "The administration has employed and authorized civilian employees to perform duties of licensed jailers. These civilian employees are **not licensed as jailers** by TCOLE as required."[43]

- "The inspection team was unable to verify, through maintained documentation, that recreation is being offered to inmates at least 3 days per week for 1 hours **as required** by minimum jail standards."[44]

80.     In sum, the multiple failures (by all named Defendants responsible for the inmates and pretrial detainees at Bexar County Jail) to maintain minimum standards, along with the evidence of intentional noncompliance, demonstrate a **pervasive pattern and practice of dereliction of duty to protect and keep detainees safe during their incarceration**. More disturbing and relevant to the issues in this case is the blatant disregard for the policies and procedures required for mental health by the jail through:

- Lack of training;

- Lack of reassessing inmate classification;

- Employing unlicensed civilian employees over critical screening intake areas; and

- Intentional circumvention of systems by employees to skip areas of required fields in the grievance tracking system.

## D. DEFENDANTS BEXAR COUNTY, SHERIFF JAVIER SALAZAR, AND UHS VIOLATED PLAINTIFF'S CONSTITUTIONAL RIGHTS BY *FAILING TO TRAIN AND/OR SUPERVISE THEIR SUBORDINATES*.[45]

107.     As alleged in the facts above, the individually named and unnamed employees/officers/supervisors under Defendants' supervision violated Plaintiff's constitutional

---

[42] 37 Tex. Admin. Code § 275.1
[43] 37 Tex. Admin. Code § 275.2 & § 275.7
[44] 37 Tex. Admin. Code § 285.1
[45] *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011) (citing *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 435 (5th Cir. 2008)).

rights. Defendants, acting with deliberate indifference, failed to follow the law as outlined above, failed to train and/or supervise their subordinates, and those failures caused the violation of the Plaintiff's rights.[46]

108.    All named Defendants failed to follow § 273.5 of the Texas Administrative Code, "Mental Disabilities/Suicide Prevention Plan" (adopted to be effective December 20, 1994, last revision 2018) requiring staff training, creating and following **procedures for intake screening to identify mental illness** (in compliance with Tex. Code Crim. Proc. Art. 16.22), **adequately providing for supervision**, and **verifying Plaintiff previously had received mental healthcare at intake as required**.

109.    Specifically, an example of failing to train is found in the "Annual Report" for calendar year 2018, which found multiple deficiencies. Defendants were advised to "**promptly initiate and complete appropriate corrective measures**."  These deficiencies included, but were not limited to, findings such as:  "**the administration was unable to provide training records to confirm that detention officers received suicide prevention training in accordance with the approved operational plans.**"[47]

110.    Furthermore, by failing to train, Defendants BEXAR COUNTY, Sheriff JAVIER SALAZAR, and UHS knew or should have known that a particular omission in the training program would cause employees to violate the constitutional rights of members of the public they encounter, but Defendants nevertheless chose to ignore the numerous training programs designed to protect Plaintiff and potentially other similarly situated arrestees and pretrial detainees.

WHEREFORE, Plaintiff prays for relief as set forth below.

---

[46] *Id.* at 446.
[47] 37 Tex. Admin. Code § 273.5(a)(1) (emphasis added)

## COUNT III - UNCONSTITUTIONAL EPISODIC ACTS AND
## OMISSIONS PURSUANT TO 42 U.S.C. § 1983 AS TO ALL DEFENDANTS

81.    Plaintiff reincorporates preceding paragraphs 1-57 as if stated fully herein.

82.    An episodic-acts-or-omissions claim, in contrast to a "conditions-of-confinement" claim, faults specific officials for their acts or omissions.[48] Here, because the individually named Defendants, Sheriff JAVIER SALAZAR, Officer JESSE SALDANA, **acted with deliberate indifference and because there was a pattern and practice of indifference** to Plaintiff's constitutional rights, **the Defendant entities are also liable for the § 1983** violations.[49] According to this Court, the relevant question for a viable episodic-acts-and-omissions claim is "whether that official breached his constitutional duty to tend to the basic human needs of persons in his charge."[50] Further, to restate the Fifth Circuit's explanation of deliberate indifference, "it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights."[51]

83.    When an official has "subjective knowledge of a substantial risk of serious harm" to the detainee and responds to that risk with deliberate indifference, a pretrial detainee's constitutional rights are violated.[52] This Court stated in *Rodriguez*, "[i]n other words, the official must know of and disregard an excessive risk to inmate health or safety."[53] **The multiple *per se* violations of Texas statutes as well as multiple examples of noncompliance with department**

---

[48] *Rodriguez v. Bexar Cnty.*, 2018 U.S. Dist. LEXIS 157585 at * 4 (discussing *Estate of Henson v. Wichita Cnty.*, Tex., 795 F.3d 456, 462 (5th Cir. 2015)).

[49] *See Id.* (discussing *Sanchez v. Young Cnty.*, Tex., 866 F.3d 274, 279 (5th Cir. 2017)) (emphasis added).

[50] *Id.* (discussing *Estate of Henson v. Wichita Cnty.*, Tex., 795 F.3d 456, 462 (5th Cir. 2015)) (quoting *Hare v. City of Corinth*, 74 F.3d 633, 645 (5th Cir. 1996)).

[51] *Rhyne v. Henderson Cnty.*, 973 F.2d 386, 392 (5th Cir. 1992).

[52] *See Id.* (discussing *Estate of Henson*, 795 F.3d at 463).

[53] *Id.*

**and agency guidelines, demonstrate that individually named Defendants knew of the substantial risk of serious harm** to Plaintiff, and likely other similarly situated detainees, and **chose to disregard that risk**, whether intentionally or through gross negligence.

84.     Here, Defendants Sheriff JAVIER SALAZAR and BEXAR COUNTY violated multiple "General Duties" required under § 511.009 of the Texas Government Code, examples include failing to "report to the Texas Correctional Office on Offenders with Medical or Mental Impairments on a jail's compliance with Article 16.22, Code of Criminal Procedure,"[54] and failing to ensure the jail adopted "reasonable rules and procedures to ensure the safety of prisoners."[55] The Fifth Circuit has consistently held that **municipal entities and local governing bodies do not enjoy immunity from suit, either absolute or qualified, under a civil action for deprivation of rights**.[56]

## A. DEFENDANT SAN ANTONIO POLICE OFFICER SALDANA HAD *KNOWLEDGE OF A RISK OF SERIOUS HARM* TO PLAINTIFF BY *NOT FOLLOWING DEPARTMENTAL PROCEDURES AND CHOSE TO DISREGARD THAT RISK.*

114.     Defendant San Antonio Police Officer JESSE SALDANA is not entitled to qualified immunity because, at the time of the multiple violations listed above, as a reasonable Officer/Official with the same information, he could not have believed that his actions were lawful. **Law enforcement officers and government officials are presumed to know the clearly established constitutional rights of individuals they encounter.**[57]

115.     Here, Heather was arrested at her home while experiencing a mental health crisis.

---

[54] 4 Tex. Gov't Code § 511.09(a)(17)

[55] 4 Tex. Gov't Code § 511.09(a)(23)(A)

[56] *Burge v. Par. of St. Tammany*, 187 F.3d 452, 466-67 (5th Cir. 1999) citing *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 166, 122 L. Ed. 2d 517, 113 S. Ct. 1160 (1993) (emphasis added).

[57] *Davis v. City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005) (emphasis added).

Heather had a history of bipolar disorder.  Defendants were aware of Heather's bipolar disorder.

For example, in his Report, Officer Saldana states:

> I made the location and observed the entire driveway full of items
> that were thrown around and broken. I could hear S-1 [Heather]
> screaming at my cover officer, J. Diaz# 844, in the kitchen. I walked
> through the garage and into the kitchen, where I attempted to de-
> escalate S-1 [Heather]. S-1 [Heather] was very agitated, and she
> would calm down then all of a sudden start screaming again. There
> were times where she would scream so loud and talk fast I could not
> understand what she was saying.  I had contact with S-1 [Heather]
> the week prior.  S-1 [Heather] stated to me she is diagnosed with
> Bipolar and other mental illnesses. It is unclear if S-1 [Heather] is
> taking her medications.

116.    Defendant San Antonio Police Officer JESSE SALDANA was required to follow

department guidelines created to protect mentally ill arrestees and he failed to do so. The San

Antonio Police Department has clearly established policies in the "San Antonio Police Department

General Manual, Procedure 611 – *Mentally Ill Persons"* setting forth policies **every police officer**

**must abide by**. Here, the numerous failings by Officer JESSE SALDANA demonstrate his

deliberate indifference, which jeopardized Plaintiff's constitutional rights and potential safety.

Specifically, Officer JESSE SALDANA failed to:

- "carefully evaluate individuals involved in a mental health crisis and determine the best course of action to take in order to resolve the situation" as required;[58]
- "recognize symptoms which may indicate the existence of mental illness" as required;[59]
- "determine the best course of action to be taken, including the need for Emergency Medical Services (EMS) or Warrantless Emergency Detention" as required;[60]
- follow the procedure whereby "any medication being taken by the individual should be transported with the individual and released to the appropriate medical or detention personnel (this shall be documented in the report)" as required;[61]
- maintain a "close and constant visual observation of the person experiencing a mental

---

[58] San Antonio Police Department General Manual, Procedure 611 – *Mentally Ill Persons, §.02(B),* and GM Procedure 802, *Unusual Occurrences and Critical Incidents*.

[59] San Antonio Police Department General Manual, Procedure 611 – *Mentally Ill Persons, §.04(A)*.

[60] San Antonio Police Department General Manual, Procedure 611 – *Mentally Ill Persons, §.07(A)*.

[61] San Antonio Police Department General Manual, Procedure 611 – *Mentally Ill Persons, §.07(F)*.

health crisis situation" and interview Plaintiff or any relatives, friends, neighbors, or other associated with the situation since she was experiencing a mental health crisis situation as required;[62]

- evaluate Plaintiff for mental illness and the crisis situation and failed to follow any of the numerous options available to them;[63]

- detain Plaintiff under a "Warrantless Emergency Detention" rather than arresting her under the SAPD department guidelines;[64]

- immediately notify Central Magistration personnel that Plaintiff was suspected of mental illness, notate the magistrate's intake slip, and transport her medication with her to the jail;[65] and

- evaluate Plaintiff for mental illness and the crisis, document and report findings and any actions taken in their respective reports, and then forward those reports to the Mental Health Detail.[66]

117. Without discovery and copies of the Defendant Officer JESSE SALDANA's personnel file, it is unknown whether he attended and received the required training on handling mentally ill persons in accordance with the San Antonio Police Department General Manual, Procedure 611 – *Mentally Ill Persons, §.12.*

118. Without discovery and training records from the City of San Antonio and San Antonio Police Department, it is unclear whether the city had an adequate training program in relation to the tasks officers must perform relative to mentally ill persons.[67] **The egregious and numerous failings on the part of the city and the officers** in handling the arrest of Plaintiff, along with her subsequent incarceration leading to her hospitalization, coma and rehabilitation, implicates the entire San Antonio Police Department/City of San Antonio for the violations of her constitutional rights.

---

[62] San Antonio Police Department General Manual, Procedure 611 – *Mentally Ill Persons, §.07(G)(1-2).*
[63] San Antonio Police Department General Manual, Procedure 611 – *Mentally Ill Persons, §.08 (Courses of Action).*
[64] San Antonio Police Department General Manual, Procedure 611 – *Mentally Ill Persons, §.08(B-F).*
[65] San Antonio Police Department General Manual, Procedure 611 – *Mentally Ill Persons, §.08(E)(2-4).*
[66] San Antonio Police Department General Manual, Procedure 611 – *Mentally Ill Persons, §.09.*
[67] *Ramirez v. Escajeda*, 298 F. Supp. 3d 933 (W.D. Tex. 2018).

119.     In sum, the information and evidence obtained thus far demonstrate a series of either willful violations or deliberate indifference of the multiple laws and procedures in place that were enacted to protect Plaintiff, as well as other potentially similarly situated pretrial detainees in Bexar County. **By simply adopting procedures to present a positive public image of care and concern for mentally ill defendants/detainees yet turning a blind eye to the pervasive willful violations by almost every employee/contractor and department involved in the arrest, intake, medical care, mental healthcare, and incarceration of detainees not only creates public distrust in the judicial system, the Bexar County Jail unconstitutionally deprived Plaintiff of her liberty and caused pain and suffering.**

WHEREFORE, Plaintiff prays for relief as set forth below.

### COUNT IV – DISCRIMINATION BY DEFENDANTS BEXAR COUNTY AND UHS UNDER THE AMERICANS WITH DISABILITIES ACT AND THE REHABILITATION ACT

85.     Plaintiff' reincorporate preceding paragraphs 1-57 as if stated fully herein.

86.     The Americans with Disabilities Act ("ADA") defines psychiatric disability as a "mental impairment that substantially limits one or more of the major life activities of [an] individual; a record of impairment; or being regarded as having such an impairment.[68] Both the ADA and the Rehabilitation Act require public entities—or private entities receiving federal funding—to provide reasonable accommodations to assist disabled person in accessing public programs and services.[69] "Although units of local governments, such as cities and counties, are "state actors" for purposes of Federal Constitution's Fourteenth Amendment, Constitution's

---

[68] 42 U.S.C. § 12102(2) (1994).
[69] *Borum v. Swisher Cnty.*, No. 2:14-CV-127-J, 2014 U.S. Dist. LEXIS 140321, at *20 (N.D. Tex. Sept. 29, 2014) discussing 42 U.S.C. § 12112(b)(5)(A); *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 222 (5th Cir. 2011).

Eleventh Amendment does not extend its state immunity from suit by private individuals in federal court to units of local government; these entities are subject to private claims for damages under Americans with Disabilities Act (42 USCS § 12101 et seq.) without Congress' ever having to rely on § 5 of Fourteenth Amendment to render them so."[70]

87.    Here, Defendants Bexar and UHS qualify as entities that must abide by the ADA and Rehabilitation Act and were required to reasonably accommodate Plaintiff Heather Forster due to her known mental disability, specifically, bipolar disorder.

88.    Defendants' treatment of Heather is consistent with Congress' finding that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem."[71]

89.    "Establishing a prima facie case of discrimination under the ADA requires the plaintiff to prove (1) that he is a qualified individual under the ADA/Rehabilitation Act; (2) that he is being excluded from participation in, or is being denied benefits, services, programs, or other activities for which a public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability."[72]

90.    The first prong of the test is easily met because Heather was arrested at her home while experiencing a mental health crisis. Heather had a history of bipolar disorder.  Defendants were aware of Heather's bipolar disorder.  For example, in his Report, Officer Saldana states:

> I made the location and observed the entire driveway full of items
> that were thrown around and broken. I could hear S-1 [Heather]

---

[70] *Board of Trustees v. Garrett,* 531 U.S. 356, 121 S. Ct. 955, 148 L. Ed. 2d 866 (2001).
[71] 42 U.S.C. § 12102(a)(2) (1994).
[72] *Id.* (discussing *Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 671-72 (5th Cir. 2004)).

> screaming at my cover officer, J. Diaz# 844, in the kitchen. I walked
> through the garage and into the kitchen, where I attempted to de-
> escalate S-1 [Heather]. S-1 [Heather] was very agitated, and she
> would calm down then all of a sudden start screaming again. There
> were times where she would scream so loud and talk fast I could not
> understand what she was saying.  I had contact with S-1 [Heather]
> the week prior.  S-1 [Heather] stated to me she is diagnosed with
> Bipolar and other mental illnesses. It is unclear if S-1 [Heather] is
> taking her medications.

Therefore, it was well-known and easily identifiable that Heather was a qualified individual. Alternatively, Heather clearly was "regarded as disabled" based upon Defendants' documentation stating that Heather had mental illness and the medical care provided to Heather, such as the administration of antipsychotic drugs.

91.     The second prong of the test is equally clear in that, "(2) prison _medical_ care is a program or service for which a public entity is responsible."[73]

92.     Although there is disagreement among the circuit courts as to the whether courts should use the definition of _intentional discrimination_ or _deliberate indifference_ standard to interpret the third prong of the test, the Fifth Circuit has "made it clear that a defendant's failure to make reasonable accommodations to the needs of disabled persons can constitute intentional discrimination under the ADA and the Rehabilitation Act.[74] ADA claims have been extended to the prison context, where "failure to make reasonable accommodations to the needs of a disabled prisoner may have the effect of discriminating against [a] prisoner because the lack of an accommodation may cause the disabled prisoner to suffer more pain and punishment than non-

---

[73] _Borum v. Swisher Cnty._, 2014 U.S. Dist. LEXIS 140321, at *21.
[74] _Id._ at *24 (discussing _Melton v. Dall. Area Rapid Transit_, 391 F.3d 669, 672 (5th Cir. 2004)). _See also Tennessee v. Lane,_ 541 U.S. 509, 531, 124 S. Ct. 1978, 158 L. Ed. 2d 820 (2004) (noting that Congress recognized "that failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion").

disabled prisoners."[75] Irrespective of which standard the Court chooses to apply, Defendants Bexar and UHS discriminated against Plaintiff Heather Forster because of her inability to pay bail to be released in conjunction with her mental illness disability.

93.     The facts and claims alleged herein support the claims for intentional discrimination by Defendants Bexar County and UHS under the ADA and Rehabilitation Act because Plaintiff Heather Forster suffered more pain and punishment than a non-disabled pretrial detainee.[76]  The most egregious examples of him suffering at the hands of Defendants, in violation of both Acts, the fact that in the forty-eight hours prior to his death, officers repeatedly notified the nurse that there were concerns about Heather, who was exhibiting aberrant lack of bowel control, shortness of breath, and confusion, yet Heather's needs were minimized, dismissed, and/or ignored.  As a result, Heather died a horrible, painful death from heart disease on April 18, 2019, just two weeks after he was incarcerated.

94.     Incredibly, all of the mistreatment and suffering leading to Heather's Lithium Toxicity, because her family called police for help when Heather was experiencing a mental health crisis.  Defendants were aware of Heather's bipolar disorder.  It is inexplicable that Heather was arrested, and incarcerated in the Adult Detention Center, rather than Emergency Mental Health Detention.

## REQUEST FOR DISCOVERY PRIOR TO GRANTING POTENTIAL 12(B)(6) OR 12(C) MOTIONS

---

[75] *Borum v. Swisher Cnty.*, 2014 U.S. Dist. LEXIS 140321 at *25 (discussing *McCoy v. Tex. Dep't of Criminal Justice*, C.A. No. C-05-370, 2006 U.S. Dist. LEXIS 55403, 2006 WL 2331055, at *7 (S.D. Tex. Aug. 9, 2006)).

[76] *See McCoy v. Tex. Dep't of Criminal Justice,* No. C-05-370, 2006 U.S. Dist. LEXIS 55403 at *7 (S.D. Tex. Aug. 6, 2006).  *See also Wright v. Tex. Dep't of Criminal Justice*, 2013 U.S. Dist. LEXIS 176222, 2013 WL 6578994, at *4-5 (N.D. Tex. Dec. 16, 2013) (denying defendant's Rule 12(b)(6) motion to dismiss on plaintiff's ADA claims where plaintiff alleged facts sufficient to plead intentional discrimination—specifically, defendant's failure to provide reasonable accommodations to a suicidal prisoner who later killed himself).

95.     Because of the limited evidence available to Plaintiff at this time, Plaintiff respectfully request that the Court withhold any 12(b)(6) or 12(c) rulings until Plaintiff have had an opportunity to conference with Defendants and receive at least limited discovery to determine the identities of the "Unknown/Unnamed" Employees/Officers liable for the numerous failures that led to the unconstitutional violations against Plaintiff Heather Forster.

WHEREFORE Plaintiff pray for relief as set forth below.

### PLAINTIFF'S PRAYER FOR RELIEF

96.     Defendants are jointly and severally liable for the wrongs complained herein, either by virtue of direct participation, acting in concert, or by virtue of encouraging, aiding, abetting, committing, and or ratifying and condoning the commission of the above-described acts and/or omissions.

97.     Plaintiff Heather Forster suffered compensatory, special, and punitive damages and are entitled to the maximum amounts allowed by law for the following:

      a.   extreme mental anguish and emotional distress as a result of being held in indefinitely in custody without proper medical and mental health treatment;

      b.   violation of Plaintiff Heather Forster's civil rights by Defendants; and

      c.   punitive damages for Defendants' egregious acts and omissions.

98.     Pursuant to 42 U.S.C. § 1988, Plaintiff requests and is entitled to attorney's fees and court costs for litigation of this matter, and all other relief to which Plaintiff is entitled to under the law.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff, HEATHER FORSTER, respectfully prays that Defendants, BEXAR COUNTY, "Unknown/Unnamed"

Officers/Employees of BEXAR COUNTY, SHERIFF JAVIER SALAZAR, Individually and Officially as an agent and/or employee of Bexar County Sheriff's Office, "Unknown/Unnamed" Officers/Employees of BEXAR COUNTY, SHERIFF JAVIER SALA-ZAR, BEXAR COUNTY HOSPITAL DISTRICT d/b/a UNIVERSITY HEALTH SYSTEMS, "Unknown/Unnamed" Officers/Employees of BEXAR COUNTY HOSPITAL DISTRICT d/b/a UNIVERSITY HEALTH SYSTEMS, BEXAR COUNTY PRETRIAL SERVICES DIRECTOR MIKE LOZITO, Officially as an agent and/or employee of Bexar County, SAPD OFFICER JESSE SALDANA, Officially as an agent and/or employee of San Antonio Police Department, CITY OF SAN ANTONIO, be cited to appear and answer herein, and that upon a final hearing of the cause, judgment be entered for the Plaintiff against Defendants, jointly and severally, together with pre-judgment interest at the maximum rate allowed by law; post-judgment interest at the legal rate, costs of the court; and such other and further relief to which Plaintiff may be entitled at law or in equity.

## JURY TRIAL DEMAND

PLAINTIFF HEREBY DEMANDS TRIAL BY JURY.


Respectfully submitted,


By: //s// Leslie Sachanowicz
        Leslie Sachanowicz, Esq.
        Texas Bar No. 17503200
        450 East Mulberry Avenue,
        Suite 401
        San Antonio, TX 78212
        Email: les.law@hotmail.com
        Tel. (210) 883-8565











