UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

HEATHER AGUILERA FORSTER,

    *Plaintiff,*

v.                                                    Case No. 5:21-cv-00765-JKP-RBF

BEXAR COUNTY, et al.,

    *Defendants.*

<u>**MEMORANDUM OPINION AND ORDER**</u>

Before the Court are two motions to dismiss (ECF Nos. 22 and 23), the first filed by Defendant Bexar County Hospital District, doing business as University Health System ("UHS" or "University Health") and the second filed by Defendants Bexar County and Sheriff Javier Salazar (collectively referred to as "County Defendants").[1] With the filing of the responses (ECF Nos. 28 and 29) and replies (ECF Nos. 30 and 31), the motions are ripe for ruling. For the reasons set forth below, the Court grants both motions in part.

## I. BACKGROUND[2]

Plaintiff commenced this action in August 2021 by filing a civil complaint against various defendants related to her arrest and detention during which she was in a mental health crisis and required ongoing mental health care. *See* Pl.'s Orig. Compl. (ECF No. 1) at 1-2. Her arrest resulted in her detention in the Bexar County Adult Detention Center ("BCADC", "Bexar County Jail", or "the Jail") and her bipolar disorder required prescribed lithium. While detained in the Jail, Plaintiff suffered lithium toxicity from prescribed medication and infections to wrist wounds.

---

[1] Although there are other defendants in this action, the Court will refer to the three movant defendants as "Defendants" for purposes of this Memorandum Opinion and Order.

[2] The background is uncontested or taken from Plaintiff's factual allegations, which the Court accepts as true consistent with the standard for motions to dismiss. At times, the Court supplements the factual background with legal precedent.

The original complaint resulted in four motions to dismiss. *See* ECF No. 8, 9, 10, and 19. The Court granted two of these motions, and after Plaintiff filed an amended complaint in response to the last of these motions, the Court partially granted the first motion and found the last one moot. *See* ECF Nos. 16, 24, and Text Order (Jan. 3, 2022).

The First Amended Complaint ("FAC") (ECF No. 21) is the current operative pleading and has led to the two pending motions to dismiss. Because the motions concern multiple defendants and claims, the Court first precisely identifies the parties and underlying events before setting out the claims asserted.

## A. Parties

Plaintiff sues UHS, Bexar County, Sheriff Salazar (in both his individual and official capacities), and various Doe Defendants. *See* FAC ¶¶ 6-8, 10, 12. While Plaintiff first identifies the Doe Defendants as "the agents, servants, and employees of Defendants Bexar County and Salazar," *see id.* ¶ 10, she later expands their identity to "the agents, servants and employees of the other Defendants," *see id.* ¶ 12, which includes UHS. Like Defendant Salazar, Plaintiff sues the Doe Defendants "in both their individual and official capacities." *Id.* ¶¶ 8, 10.

### 1. <u>UHS</u>

"UHS is a political subdivision of the state of Texas, and a public health system created in 1955 to provide medical care to the indigent of Bexar County." FAC ¶ 6. The Texas Supreme Court has held that countywide hospital districts are political subdivisions of the State, authorized by the Texas Legislature to "provide for the establishment of a hospital or hospital system to furnish medical aid and hospital care to indigent and needy persons residing in the district." *Klein v. Hernandez*, 315 S.W.3d 1, 7 (Tex. 2010) (quoting Tex. Health & Safety Code § 281.002(a)). UHS is a distinct entity from Bexar County. *Rodriguez v. Bexar Cnty.*, No. SA-18-CV-248-XR, 2018 WL 4431433, at *3 (W.D. Tex. Sept. 17, 2018). UHS provides primary care services at the Bexar

County Jail. FAC ¶ 6.

UHS concedes that it owns and operates University Hospital. ECF No. 22 at 2. It further concedes that it "provides health care services" to persons at the BCADC and "employs the nurses, social workers, and some of the 'mid-level providers' who provide medical and nursing care and treatment at University Hospital or as part of the division of Detention Health Care Services at the BCADC." *Id*. But it contends that "physicians who provide care to patients at University Hospital are UTHealth employees (faculty, residents and fellows)." *Id*. Because Plaintiff neither concedes this contention nor provides any allegations in her FAC to support it, the contention has no relevance at this stage of the case other than to provide context for later arguments of UHS.

### 2. Underlying County Defendants

"Defendant Bexar County (the 'County') is a municipal corporation organized under the laws of the State of Texas" and the "Sheriff's Department is a division of Bexar County [that] operates the Bexar County Jail." FAC ¶ 7. Sheriff Salazar is an agent of Bexar County. *See id.* ¶ 8. Indeed, "[a]s the elected Sheriff, Salazar is the 'agency head' of the Bexar County Sheriff's Office." *Medrano v. Salazar*, No. 5:19-CV-00549-JKP, 2020 WL 589537, at *9 (W.D. Tex. Feb. 5, 2020). Under Texas law, "[t]he sheriff of each county is the keeper of the county jail." Tex. Loc. Gov't Code Ann. § 351.041(a). Sheriffs, furthermore, "shall safely keep all prisoners committed to the jail by a lawful authority, subject to an order of the proper court." *Id*. Although sheriffs, "may appoint a jailer to operate the jail and meet the needs of the prisoners . . . the sheriff shall continue to exercise supervision and control over the jail." *Id*. § 351.041(b). Plaintiff asserts that, as jail administrator, the Sheriff "is the official ultimately responsible for the safety of the detainees held in the Jail." FAC ¶ 140.

### B. Underlying Events

At the time of her arrest on November 3, 2020, Plaintiff was experiencing a mental health

crisis related to a known bipolar disorder. *See* FAC ¶¶ 21-24. Arresting officers handcuffed her and placed her in leg shackles. *Id*. ¶ 26. "The deputies fastened her handcuffs and shackles so tightly that it broke the skin on her wrists and ankles." *Id*. ¶ 30. The deputy who removed her handcuffs noticed her swollen hands and a laceration on her right wrist. *Id*. ¶ 32. Due to the laceration, a nurse saw Plaintiff but did not treat her injuries. *See id*. ¶ 33 (a "not" is apparently missing from one sentence in paragraph).

Plaintiff continued to act irrationally, aggressively, and violently. *See id*. ¶¶ 33-35. Given her behavior, she was placed in a "restraint chair" with a "bite guard." *Id*. ¶ 36. She was later "taken to University Hospital to get blood drawn" and the nurse present on her arrival knew Plaintiff "was psychotic." *Id*. ¶ 37. At that time, Plaintiff took "a tablet of Zyprexa, and then slept for the first time." *Id*.

During "early November" Plaintiff "was not taken to the medical ward or infirmary," even though the nursing staff knew of her mental disturbance and "knew she was acutely ill with mania and psychosis." *Id*. ¶ 39. Plaintiff "did see two registered nurses briefly," but received no treatment. *Id*. After changing cells, Plaintiff had messy diarrhea. *Id*. ¶ 40. "During the next few days, medical staff members visited her and "gave her a COVID-19 test and chest x-ray." *Id*. ¶ 41. They had a list of her mediations "because her psychiatrist had faxed them a copy." *Id*.

Plaintiff "recalls receiving her medication only one time." *Id*. ¶ 42. Her wrist wounds "started to become infected," "her right hand swelled greatly," "[p]us leaked from both" wrist wounds, "and she had red streaks up her arms." *Id*. ¶ 43. One could see that "[her] hand was obviously infected." *Id*. ¶ 46. She was feverish and recalls being sick and losing control of her bowels. *Id*. ¶ 44. At one point, a housekeeper noticed her hand. *Id*. "While in solitary confinement, [her] hand hurt so badly that she would scream at night." *Id*. ¶ 46.

On November 11, 2020, jail personnel took Plaintiff "to the infirmary and medical part of

the Jail." *Id*. ¶ 45. Deputies wanted her "to take medication for her psychosis" and, as she reached for medication, they noticed her hand. *Id*. "The deputies in the infirmary clearly had not been told about [her] infected hand and contacted the nurse practitioner to examine the hand." *Id*. ¶ 46. After examining the hand, the "nurse practitioner" told Plaintiff "that she needed to go to the hospital due to a bad case of cellulitis." *Id*. ¶ 47. Upon arriving at the hospital, "nurses were shocked at her infection." *Id*. ¶ 48. They administered various antibiotics and fluids to treat her sepsis. *Id*. ¶ 49.

The next day, Plaintiff was permitted to shower for the first time since arriving at the jail. *Id*. ¶ 51. That day, "psychiatry" first saw her "and determined that she was severely manic and psychotic." *Id*. ¶ 52. At that time, Plaintiff "continued to hear and smell things very acutely and was unconnected to reality." *Id*. Doctors prescribed "Lithium at 600 mb BID because it was the only medication the Jail had" and "Zyprexa so she could sleep." *Id*. No one tested her "blood-lithium level" before prescribing lithium. *Id*. ¶ 53. "Over the next few days," Plaintiff "continued to receive antibiotics and large amounts of fluids," improved psychologically due to the medications, and was finally able to sleep. *Id*. ¶ 54.

On November 17, 2020, Plaintiff began oral antibiotics, and she was sent back to the Jail to be detained in general holding. *Id*. ¶ 55. For the next two weeks, she continued taking her medications and antibiotics, "but she was not eating or drinking" and she "told the nurses who came to dispense her medication that she was falling against things, had blurred vision, and was unable to stand." *Id*. ¶ 56. She told them "she needed to stop taking the lithium because she was getting lithium toxicity" and she "developed diarrhea, which is a late side effect of lithium toxicity." *Id*.

Plaintiff went to the infirmary again on December 5, 2020, where the examining nurse witnessed her "struggling to stand and walk and that she had uncontrollable diarrhea." *Id*. ¶ 57. But "medical staff did not test [her] blood-lithium level," "failed to realize that [she] was acutely ill due to lithium toxicity," and did not send her to the hospital. *Id*. The next day, Plaintiff "suffered

a seizure." *Id.* ¶ 58. Her next memory was waking "in the ICU at the hospital . . . unaware that she had been in a coma, had dialysis, and had encephalitis." *Id.*

Plaintiff alleges that her "medical records show that she was diagnosed with 'severe lithium toxicity,' which was 'discovered [upon] admission to the hospital.'" *Id.* ¶ 59. Hospital doctors "concluded that the seizure suffered at the Jail resulted from lithium toxicity" and that the toxicity "caused 'sustained altered mental status, full body tremors, and acute kidney injury.'" *Id.* ¶¶ 60-61.

In summary, with respect to her wrists, Plaintiff "did not receive treatment . . . until several days after they became seriously infected," despite repeated complaints "to sheriff's deputies and Defendant UHS's agents and employees . . . and screaming in pain after they became infected." *Id.* ¶ 50. As to her lithium toxicity, she alleges that while in its care, UHS, prescribed and dispensed lithium to her but did not check her blood-lithium level at any time; neither prior to prescribing the medication nor during the course of treatment. *Id.* ¶¶ 53, 96-97.

**C. Other Allegations and Incidents Regarding Medical Treatment at the Jail**

Plaintiff alleges that UHS has a policy and practice of failing to properly monitor mental health patients who are prescribed new medication for their mental health issues. *See id.* ¶¶ 75-107. As a result, she suffered severe lithium toxicity. *Id.* ¶¶ 59-61, 67. She alleges that, while UHS routinely prescribes lithium to treat bipolar disorder, it does not, as a matter of policy, monitor patients either by ordering routine bloodwork, conducting regular checkups, or engaging in additional observation to ensure that detainees do not suffer lithium toxicity as a result of taking the medication. *Id.* ¶¶ 76, 91.

Plaintiff further alleges UHS has "failed to train its agents and employees to conduct lithium testing, recognize the symptoms of lithium toxicity, and seek immediate medical help for people experiencing symptoms of lithium toxicity." *Id.* ¶ 98. She alleges that lithium toxicity

presents as nausea and vomiting, severe hand tremors, slurred speech, confusion, vision changes, unsteadiness, and lethargy and that UHS has not trained its employees to recognize these signs and symptoms. *Id.* ¶¶ 89, 100. And, importantly, UHS has not trained employees as to what action must be taken when a detainee displays signs of lithium toxicity. *Id*. ¶¶ 98, 103. Had employees been properly trained, she would not have suffered lithium toxicity. *Id*. 138-39.

Plaintiff further alleges that the County Defendants have a documented pattern and practice of noncompliance with minimum jail standards. *Id*. ¶¶ 108-33. She makes numerous allegations regarding other incidents about medical treatment at the Jail following Sheriff Salazar being sworn into office on January 1, 2017. *See id*. For ease of reference, the Court simply lists the most relevant of these allegations:

> July 24, 2017, Sheriff received notice from Texas Commission on Jail Standards ("TCJS") outlining the requirements all sheriffs must follow to comply with a newly enacted Texas law, S.B. 1849 ("The Sandra Bland Act"), which amended Tex. Code Crim. Proc. Art. 16.22 and required compliance by specific dates in 2018. (FAC ¶ 111).

> February 22, 2019, the Jail was listed as noncompliant with minimum jail standards regarding provision of medical and health services to detainees and the supervision of detainees, including a face-to-face observation requirement. (FAC ¶¶ 114-15, 118).

> September 2019, Sheriff Salazar sent a letter to UHS indicating that he had opened a criminal investigation into the failure of UHS to provide adequate medical care at the Jail, but other alleged facts indicate that no such investigation occurred. (FAC ¶¶ 124-27).

> Between December 14, 2018, and August 5, 2019, nine detainees died while in the Jail, and several others have died since then. (FAC ¶¶ 129-30).

> December 2021, two detainees died at the Jail. (FAC ¶¶ 131-33).

**D. Claims**

Plaintiff characterizes her asserted claims as follows: (1) "Unconstitutional Conditions of Confinement" against UHS and Sheriff Salazar under 42 U.S.C. § 1983; (2) "Episodic Acts" and "Excessive Force" against Doe Defendants under § 1983; and (3) "Discrimination on the Basis of

Disability" against all defendants under the Americans with Disabilities Act ("ADA") and Rehabilitation Act ("RA"). FAC ¶¶ 134-67. To better understand the extent and nature of these claims, the Court examines them with supporting allegations for each defendant. But before doing so, the Court addresses a clear pleading deficiency within the amended complaint.

Each of Plaintiff's claims begin with: "Plaintiff realleges and incorporates by reference the preceding and subsequent paragraphs of this Complaint, including all Exhibits, as if set forth fully herein." *See id*. ¶¶ 134, 149, 155, 159. This is a type of shotgun pleading that has been widely criticized by the courts. *See Valadez v. City of San Antonio*, No. SA-21-CV-0002-JKP-RBF, 2022 WL 1608016, at *5-8 (W.D. Tex. May 20, 2022) (discussing issue in depth). While it would be better for Plaintiff to avoid using such overly broad incorporation paragraphs and to simply incorporate relevant factual allegations into her asserted claims, she does not appear to construe the incorporation as broadly as worded. Because no one expresses concern about the incorporation paragraphs and because Plaintiff makes no arguments that suggest that she indeed incorporates everything into each claim, the Court construes the incorporation paragraphs as merely incorporating relevant factual allegations into each specifically asserted claim. With that clarification of Plaintiff's pleading, the Court now examines the claims.

### 1. Claim 1 ("Unconstitutional Conditions of Confinement")

In Claim 1, Plaintiff contends that the Fourteenth Amendment requires jail officials "to provide for the reasonable health and safety of persons in pretrial custody." FAC ¶ 135. She asserts:

> Defendant UHS has a policy and practice of failing to properly monitor mental health detainees who are prescribed new medication, including lithium, to treat their mental health issues, in conscious disregard of the known risk of serious harm that may result from adverse reaction to the medications it prescribes. The need for different policies and practices are so obvious that the failure to promulgate and implement them constitutes deliberate indifference.

*Id*. ¶ 136. She further asserts that "UHS does not conduct blood-lithium testing—the only medically recognized and universally accepted way to monitor lithium levels—before prescribing

8

lithium to detainees with mental health issue or conduct testing while detainees are taking lithium" despite the ease with which one can accidently overdose on lithium. *Id*. ¶ 137. She also asserts that UHS has "failed to train and supervise its subordinates to properly monitor detainees with mental health issues who are prescribed new medications" and that the training need is so obvious as to make the failure deliberately indifferent. *Id*. ¶ 138. She contends that "UHS's policies and practices directly caused [her] to suffer lithium poisoning and the excruciating physical pain and emotional suffering that resulted therefrom." *Id*. ¶ 139.

As to Defendant Salazar, Plaintiff asserts that, because he is "ultimately responsible" for detainees at the Jail, he "has failed to ensure that Defendant UHS provides adequate medical treatment to Detainees at the Jail." *Id*. ¶ 140. She further asserts that the Sheriff has failed to investigate "Defendant UHS and has made no attempt to remedy Defendant UHS's failure to provide adequate treatment to detainees at the Jail." *Id*. ¶ 142. She contends that his "failure to train, discipline, and supervise Defendant UHS evinces deliberate indifference to" the serious medical needs of detainees "and directly caused [her] to suffer lithium poisoning and the resultant excruciating physical pain and emotional suffering." *Id*. ¶ 143. She also alleges that the Sheriff "has a documented pattern and practice of noncompliance with Texas's minimum jail standards relating to properly protecting and caring for detainees with mental health issues." *Id*. ¶ 144. More specifically, she contends that he has failed to ensure that "subordinates conduct periodic visual checks" of detainees "to ensure their safety and wellbeing." *Id*. ¶ 145.

Plaintiff further alleges that she "suffered wrist injuries that went untreated for several days, despite her screaming in pain, telling . . . deputies that she was injured, and . . . deputies seeing and acknowledging that she was injured." *Id*. ¶ 146. She asserts that the booking deputies "were responsible for monitoring her during the first days of her incarceration failed to properly monitor her, ignored her injuries and pleas for help, and did not seek medical treatment for her."

*Id*. She submits that the "deputies' failure to seek medical care for [her] is also evidence that Defendant Salazar has failed to train and supervise them in timely seeking medical care when a detainee is injured, which also constitutes deliberate indifference." *Id*. ¶ 147. Further, she alleges that "[a]s a direct result of [the Sheriff's] policies and practices," she "suffered sepsis, a life-threatening condition that occurred because her wrist became infected." *Id*. ¶ 148.

### 2. **Claims 2 ("Episodic Acts") and 3 ("Excessive Force")**

Plaintiff asserts Claims 2 and 3 only against Doe Defendants. *See id*. ¶¶ 149-58. But she also sues these defendants in both their official and individual capacities. *See id*. ¶¶ 8, 10. These claims are pertinent to the instant motions to dismiss to the extent they relate to challenged claims and to the extent any movant seeks to dismiss them.

Claim 2, denominated as "Episodic Acts," concerns Doe Defendants allegedly ignoring Plaintiff's complaints about "symptoms related to lithium toxicity and the physical manifestations of her illness," in addition to her complaints about her wrists and the resulting infection of wrist wounds. *Id*. ¶¶ 150-54. The excessive force claim relates to Doe Defendants fastening her "handcuffs so tight that it caused lacerations and swelling, which eventually got infected and caused sepsis." *Id*. ¶ 157.

### 3. **Claim 4 (Violations of ADA and RA)**

With Claim 4, Plaintiff purports to assert that all defendants have discriminated against her on the basis of her disability. *Id*. ¶¶ 159-67. Despite the heading of Claim 4 identifying "all defendants," it is clear from the body of the amended complaint that Plaintiff asserts the claim only against Bexar County and UHS, entities covered by the ADA and RA. *See id*. ¶ 161.

### D. Motions to Dismiss and Related Briefing

On January 11, 2022, and pursuant to Fed. R. Civ. P. 12(b)(6), UHS moved to dismiss all claims asserted against it. *See* ECF No. 22. Two days later, the County Defendants moved to

dismiss the claims against them. *See* ECF No. 23. To the extent Plaintiff sues Sheriff Salazar in his individual capacity, the Sheriff invokes qualified immunity. *See id.* at 5. When Plaintiff failed to file a response to either motion, the Court issued an order directing her to show cause why the Court should not dismiss the case for want of prosecution under Fed. R. Civ. P. 41(b). *See* ECF No. 25. The show cause response was due February 17, 2022. *Id.*

Two days prior to the deadline, Plaintiff moved for an extension of time to respond to the show cause order. *See* ECF No. 26. In an effort to show good cause for the extension, she stated that (1) her attorney had finished a seven-day jury trial on January 25, 2022; (2) counsel's wife had contracted Covid the first week in February and counsel had to "be the primary caregiver"; and (3) that "arbitrarily," forty-six of counsel's misdemeanor County Court cases were reassigned to different courts and given separate zoom appearances the first half of February. *Id.* The Court found good cause and extended the time to respond to the show cause order to February 24, 2022. *See* Text Order (Feb. 16, 2022).

Rather than file a response directly addressing the show cause order, and without filing a motion for an extension to file responses to the motions to dismiss, Plaintiff filed motion responses on February 24, 2022. The respective defendants thereafter timely filed replies continuing to challenge Plaintiff's claims on the merits while also raising procedural issues caused by Plaintiff's initial failure to file timely motion responses. The motions are ripe for ruling.

## II. PRELIMINARY MATTERS

Before addressing the merits of the motions, the Court addresses procedural matters raised in reply and Plaintiff's asserted official capacity claims.

### A. Procedural Infirmities

Due to procedural infirmities resulting from Plaintiff's failure to timely respond to the motions to dismiss or to directly respond at all to the order to show cause, UHS asks the Court to (1)

dismiss the case for failure to prosecute or (2) strike the response to its motion as untimely and consider the motion as unopposed. *See* ECF No. 30. In their reply, the County Defendants likewise urge the Court to strike the untimely response to their motion and consider their motion as unopposed. *See* ECF No. 31.

In general, the local rules of this Court provide for a fourteen-day response period for motions other than "a discovery or case management motion." W.D. Tex. Civ. R. 7(d)(2). Because the motions to dismiss at issue here are neither discovery nor case management motions and because W.D. Tex. Civ. R. 15 does not apply on the current facts, Plaintiff had fourteen days to timely respond to the motions to dismiss. She clearly did not do so.

"When there is no timely response, 'the court may grant the motion as unopposed.'" *Herrera v. PHH Mortg. Corp.*, No. 5:19-CV-1052-JKP, 2019 WL 4917921, at *1 (W.D. Tex. Oct. 4, 2019) (quoting W.D. Tex. Civ. R. 7(e)(2), which is now found in Local Court Rule 7(d)(2)). After the passing of the response time, the Court could have granted the motions as unopposed, but it did not. Nor did it address the motions on their merits as permitted in its discretion. *See Suarez v. Ocwen Loan Servicing, LLC*, No. 5:15-CV-664-DAE, 2015 WL 7076674, at *2 (W.D. Tex. Nov. 12, 2015). The Court instead found that the circumstances warranted the issuance of a show cause order regarding Plaintiff's apparent failure to prosecute this case.

For good cause shown, the Court later extended the time to respond to the show cause order to February 24, 2022. But instead of responding to the show cause order, Plaintiff filed untimely responses to the pending motions without leave of court. The Court now considers the repercussions flowing from the failure to directly respond to the show cause order and from the filing of the untimely responses to the motions without leave of court.

A district court may dismiss an action for failure to prosecute or to comply with any order. *See* Fed. R. Civ. P. 41(b); *McCullough v. Lynaugh*, 835 F.2d 1126, 1127 (5th Cir. 1988). In general,

courts using Rule 41(b) to dismiss claims do so without prejudice to the claim being later pursued by the same party. While courts have discretion to decide whether dismissal for failure to prosecute is warranted, dismissals with prejudice under Rule 41(b) require "a showing of (a) a clear record of delay or contumacious conduct by the plaintiff, and (b) where lesser sanctions would not serve the best interests of justice." *Griggs v. S.G.E. Mgmt., LLC*, 905 F.3d 835, 844 (5th Cir. 2018).

On the record before it, the Court finds dismissal under Rule 41(b) unwarranted. Although Plaintiff did not directly respond to the show cause order, her motion for extension clearly exhibits an intent to prosecute this case. That motion, filed before the show cause deadline, indirectly shows cause for not issuing a failure-to-prosecute dismissal. And while Plaintiff failed to directly comply with the show cause order, the failure does not justify any dismissal under Rule 41(b). There is no clear record of delay or contumacious conduct. The motion seeking an extension of time provides some reasoning for the delay, showed good cause for the requested extension, and indicates an intent to prosecute the case.

The Court is uncertain why counsel for Plaintiff did not directly respond to the show cause order or seek leave to file her untimely motion responses. Filing untimely motion responses does not satisfy the duty to respond to a court order. But, as mentioned, the extension of time indirectly responds to the show cause order in that it shows an intent to prosecute the case. The Court limited the show cause order to want of prosecution and it finds no basis to dismiss this case for want of prosecution or a failure to comply with a court order.

Defendants also seek an order striking the motion responses as untimely. Such action is within the Court's discretion. *See Kitchen v. BASF*, 952 F.3d 247, 254 (5th Cir. 2020); *Hutton v. Bank of N.Y. Mellon Tr. Co., N.A.*, 847 F. App'x 252, 253 (5th Cir.) (per curiam), *cert. denied*, 142 S. Ct. 713 (2021). Plaintiff, furthermore, has provided no satisfactory reason for missing the original deadline for filing a response to the motions to dismiss. In her motion for extension of time to

respond to the show cause order, she provides only one reason that can be viewed as any sort of reason for failing to file a timely response to the motions to dismiss – a seven-day trial that ended on January 25, 2022, the date Plaintiff's response was due on the first motion to dismiss. But that reason does not explain a failure to move for an extension of time to respond to the motions. The other proffered reasons for obtaining an extension of time to respond to the show cause order relate to matters that occurred in early February 2022 and cannot be viewed as a reason for failing to timely respond to the motions to dismiss. By that point, both responses were already untimely. Given the circumstances presented, the Court would be well within its discretion to strike the untimely motion responses.

But even if the Court were to strike the responses, that would not mandate granting the motions to dismiss as uncontested. While the local rules of this Court provide discretion for it to do so, the typical practice of the undersigned is to assure that dismissal is proper under the applicable law. Not only is this a matter of thoroughness, but it holds movants to applicable burdens under the law.

Because Defendants invoke Fed. R. Civ. P. 12(b)(6), the motions prompt consideration of the well-established standards set out in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "To prevail on a motion to dismiss an ordinary claim under Fed. R. Civ. P. 12(b)(6)," the defendant "must show" that the plaintiff is unable to satisfy the applicable standard for stating a claim under Fed. R. Civ. P. 8(a). *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994) (discussing standard applied prior to *Twombly*). "This means that, despite the natural focus on the allegations of the operative pleading, the movant has the burden on a motion to dismiss under Rule 12(b)(6)." *Cantu v. Guerra*, No. SA-20-CV-0746-JKP-HJB, 2021 WL 2636017, at *1 (W.D. Tex. June 25, 2021).

In general, courts "may find conclusory statements insufficient to support dismissal under

Rule 12(b)(6), especially when the movant disregards relevant portions of the operative pleading." *Id.* And movants fail to carry their burden when they fail to present "argument or authority for the plaintiffs to refute or this Court to consider." *# 1 Fan Co., LLC v. Pepco Licensed Prod., Inc.*, No. SA-09-CA-1029-FB, 2011 WL 13269165, at *2 (W.D. Tex. Mar. 16, 2011). But, when relying on the defense of qualified immunity, a movant may carry that burden merely by asserting the defense, which then shifts the burden to the plaintiff to rebut it. *Mitchell v. Mills*, 895 F.3d 365, 370 (5th Cir. 2018).

Once the movant invokes Rule 12(b)(6), the Court examines any asserted legal bases for dismissal, including reviewing the factual allegations under well-established standards to determine whether the pleading states a claim upon which relief can be granted. Responsive argument by a party may be helpful in this regard, but it is by no means necessary. Claims in a pleading may be so clearly legally or factually deficient that they warrant dismissal. But it is equally true that claims may be so clearly sufficient both legally and factually so as to withstand a motion to dismiss.

In this instance, it appears that the better course is to address the matters raised through the pending motions to dismiss on their merits as fully briefed rather than striking untimely responses. Although Plaintiff has not stated any sufficient reason for missing the original deadline, her attorney did provide a reason that would have garnered a reasonable extension had counsel sought it. It is clear that fault for the untimely responses lies with counsel not Plaintiff herself. Defendants, furthermore, have filed replies to the late responses. Nothing suggests that Plaintiff or her attorney acted in bad faith or otherwise intentionally delayed responses to the detriment of any movant. It simply appears that counsel overlooked the response deadline during a busy time and failed to seek an appropriate extension of time to respond. While this does not satisfactorily explain the failures to timely respond, the length of delay has had negligible impact on the proceedings and there is no

prejudice to any movant by considering the untimely responses. For these reasons, the Court declines to strike either response.

## B. Official Capacity Claims

Plaintiff sues Sheriff Salazar and the Doe Defendants in both their individual and official capacities. FAC ¶¶ 8, 10. In individual or personal-capacity suits, plaintiffs "seek to impose personal liability upon a government official for actions he takes under color of state law." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). "Official-capacity suits," on the other hand, "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Id.* (quoting *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 690, n.55 (1978)). If "the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id.* at 166. Courts, moreover, may dismiss official-capacity claims as duplicative when the "allegations duplicate claims against the respective governmental entities themselves." *Castro Romero v. Becken*, 256 F.3d 349, 355 (5th Cir. 2001).

As already mentioned, Sheriff Salazar is an agent of Bexar County. *See* FAC ¶ 8; *Medrano v. Salazar*, No. 5:19-CV-00549-JKP, 2020 WL 589537, at *9 (W.D. Tex. Feb. 5, 2020). The Doe Defendants are likewise agents of their respective entities. Although Plaintiff sues both the entities and the agents, she purports to assert different claims against them. *See id.* ¶¶ 6-8, 10, 12 (naming the various defendants), ¶¶ 134-48 ("Unconstitutional Conditions of Confinement" only against the Sheriff and UHS), ¶¶ 149-54 ("Episodic Acts" only against Doe Defendants); ¶¶ 155-58 (excessive force only against Doe Defendants); ¶¶ 159-67 (ADA and RA claims against entity defendants).

Nevertheless, to the extent the claims against the Sheriff are official-capacity claims, the claims are effectively against Bexar County. Both defendants are represented by the same

attorneys and there is no question that Bexar County has notice of all claims asserted in this case. In these circumstances, the Court will dismiss the official-capacity claims against the Sheriff and treat such claims as being asserted against Bexar County. *See Ule v. Bexar Cnty. Hosp. Dist.*, No. 5:19-CV-01459-JKP-ESC, 2020 WL 5644930, at *5 (W.D. Tex. Sept. 22, 2020) (dismissing official capacity claims as duplicative and permitting the claims to proceed against Bexar County only).

Likewise, to the extent the claims against the Doe Defendants are official-capacity claims, the claims are effectively against their respective entities – Bexar County or UHS. The episodic acts that form the basis for Claim 2 also relate to Claim 1. Consequently, Claim 2 duplicates Claim 1 to the extent Plaintiff sues the Doe Defendants in their official capacity. The Court thus dismisses such official capacity aspect of Claim 2 and treats such aspect as being asserted against the relevant entity.

Although Plaintiff broadly states that she sues the Doe Defendants in their official capacity, the excessive force claim set out in Claim 3 is not based upon any alleged policy or customary practice. There is no basis to view Claim 3 as being brought against any individual in their official capacity. Accordingly, the Court views Claim 3 as being asserted against the Doe Defendants only in their individual capacities.

### III. APPLICABLE LEGAL STANDARD

Under Fed. R. Civ. P. 12(b)(6), litigants may move to dismiss asserted claims for "failure to state a claim for which relief can be granted." As required by Fed. R. Civ. P. 8(a)(2), every pleading that states a claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Such requirement provides opposing parties "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

In general, a court addressing a motion under Rule 12(b)(6) "must limit itself to the contents of the pleadings, including attachments thereto." *Brand Coupon Network, LLC v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014) (citation omitted). And when a pleading refers to documents that are central to a claim, the Court may consider such documents if attached to the motion to dismiss. *Lone Star Fund V (U.S.), LP v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010); *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000). Additionally, the Court may consider judicially noticed facts through Fed. R. Evid. 201, *Basic Cap. Mgmt., Inc. v. Dynex Cap., Inc.*, 976 F.3d 585, 588 (5th Cir. 2020), and take judicial notice of matters of public record, *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007).

The County Defendants attach four documents to their motion to dismiss and argue that the Court may take judicial notice of them. *See* ECF No. 23 at 9 n.5; ECF No. 23-1 (attachments). "Such attachment prompts 'an obvious threshold question that often arises' in the context of a motion to dismiss, i.e., whether the attachment constitutes a matter 'outside the pleadings' for purposes of Fed. R. Civ. P. 12(d)." *O'Malley v. Brown Bros. Harriman & Co.*, No. SA-19-CV-0010-JKP, 2020 WL 1033658, at *3 (W.D. Tex. Mar. 3, 2020) (quoting *Gen. Retail Servs., Inc. v. Wireless Toyz Franchise, LLC*, 255 F. App'x 775, 785 (5th Cir. 2007)). Rule 12(d) provides:

> If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

If the Court concludes that the attachment is a matter outside the pleadings and does not exclude it, Rule 12(d) mandates that the Court treat the motion to dismiss as one for summary judgment. But the decision to accept or reject a proffered matter outside the pleadings is within the court's "complete discretion." *Isquith ex rel. Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 193-94 & n.3 (5th Cir. 1988).

Although the County Defendants suggest that the attached documents are a matter of public record, they present no basis to reach that conclusion. Thus, for the Court to review the documents without converting their motion to one for summary judgment, the documents must be permitted as a judicially noticed fact. Rule 201(b) permits courts to take judicial notice of a "fact that is not subject to reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." The Court finds the first two attached pages readily fit criterion two in that they comprise a Re-Inspection Report of TCJS dated November 8, 2019, which shows that the inspection revealed no deficiencies as of that date. *See* ECF No. 23-1 at 1-2. The Court will consider those pages. Notably, Plaintiff has voiced no objection to considering any of the attached pages. The Court sees no need to consider pages three and four of the attachment.

When ruling on a motion to dismiss, furthermore, courts "accept all well-pled facts as true, construing all reasonable inferences in the complaint in the light most favorable to the plaintiff." *White v. U.S. Corr., LLC*, 996 F.3d 302, 306-07 (5th Cir. 2021). But courts "do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Heinze v. Tesco Corp.*, 971 F.3d 475, 479 (5th Cir. 2020) (citations and internal quotation marks omitted). And as previously mentioned, despite the natural focus on the allegations of the operative pleading, the party moving for dismissal under Rule 12(b)(6) has the burden to show that dismissal is warranted. *Cantu v. Guerra*, No. SA-20-CV-0746-JKP-HJB, 2021 WL 2636017, at *1 (W.D. Tex. June 25, 2021).

"[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the alleged] facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (citation omitted). Nevertheless, plaintiffs must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555;

*accord Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasizing that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions"). Plaintiffs need not plead the legal basis for a claim, but they "must plead facts sufficient to show that [the] claim has substantive plausibility." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 12 (2014) (per curiam). And they satisfy that standard when they allege "simply, concisely, and directly events" that are sufficient to inform the defendants of the "factual basis" of their claim. *Id.*

Facts alleged by the plaintiff must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

> To withstand a motion to dismiss under Rule 12(b)(6), a complaint must present enough facts to state a plausible claim to relief. A plaintiff need not provide exhaustive detail to avoid dismissal, but the pleaded facts must allow a reasonable inference that the plaintiff should prevail. Facts that only conceivably give rise to relief don't suffice. Thus, though we generally take as true what a complaint alleges, we do not credit a complaint's legal conclusions or threadbare recitals of the elements of a cause of action.

*Smith v. Heap*, 31 F. 4th 905, 910 (5th Cir. 2022) (quoting *Mandawala v. Ne. Baptist Hosp.*, 16 F.4th 1144, 1150 (5th Cir. 2021)). As *Twombly* states, to avoid dismissal under Rule 12(b)(6), plaintiffs must allege facts that "nudge" an asserted claim "across the line from conceivable to plausible." 550 U.S. at 570. The focus is not on whether the plaintiff will ultimately prevail, but whether that party should be permitted to present evidence to support adequately asserted claims. *Id.* at 563 n.8.

"When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense." *Cantrell v. City of Murphy*, 666 F.3d 911, 918 (5th Cir. 2012). In the context of a motion to dismiss, plaintiffs carry this burden when their operative pleading alleges that (1) "defendants committed a constitutional violation under current law" and (2) "the defendants' actions were objectively unreasonable in light of the law that was clearly established at the time of the actions complained of." *Club Retro, LLC v. Hilton*, 568 F.3d 181,

194 (5th Cir. 2009) (quoting *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc) (per curiam)).

While "formulaic recitations or bare-bones allegations will not survive a motion to dismiss," *Shaw v. Villanueva*, 918 F.3d 414, 419 (5th Cir. 2019), compliance with *Iqbal* and *Twombly* requires only that the facts plausibly allege a constitutional violation. And the Court views the actions of a defendant for objective unreasonableness as alleged in the operative pleading, not as it would on summary judgment. As the Supreme Court recognized long ago,

> the legally relevant factors bearing upon the [qualified immunity] question will be different on summary judgment than on an earlier motion to dismiss. At that earlier stage, it is the defendant's conduct as alleged in the complaint that is scrutinized for "objective legal reasonableness." On summary judgment, however, the plaintiff can no longer rest on the pleadings, and the court looks to the evidence before it (in the light most favorable to the plaintiff) when conducting the [qualified immunity] inquiry.

*Behrens v. Pelletier*, 516 U.S. 299, 309 (1996) (emphasis in original) (citation omitted); *accord McClendon*, 305 F.3d at 323. Naturally, "a defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion for summary judgment must accept the more stringent standard applicable to this procedural route." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004). This means that any "party endeavoring to defeat a lawsuit by a motion to dismiss for failure to state a claim faces a 'higher burden' than a party proceeding on a motion for summary judgment." *Id*.

## IV. SECTION 1983

Plaintiff brings her first claim under 42 U.S.C. § 1983 and characterizes it as "Unconstitutional Conditions of Confinement." *See* FAC ¶¶ 134-48. She also brings Claims 2 and 3 under § 1983. *See id.* ¶¶ 149-58. And as discussed earlier, the episodic acts of Claim 2 relate to Claim 1 to the extent Plaintiff pursues Claim 2 against Doe Defendants in their official capacity. The Court already set out the details of these claims. From those details, it is clear that Plaintiff asserts various

distinct § 1983 claims under the broad umbrella of Claim 1. To minimize confusion, the Court will refer to these distinct claims as aspects of Claim 1.

To summarize, Plaintiff's first claim against UHS has three potentially distinct aspects: (1) "a policy and practice of failing to properly monitor mental health detainees who are prescribed new medication" (FAC ¶ 136); (2) a failure to "conduct blood-lithium testing" (FAC ¶ 137); and (3) a failure to train and supervise its subordinates to monitor detainees with mental health issues (FAC ¶ 138). Each of these aspects relate to her mental health issues and prescribed lithium. To the extent Claim 2 is asserted against UHS through its official capacity aspect, the claim relates to Plaintiff's mental health issues, prescribed lithium, and wrist infections. Claim 3 is not asserted against UHS or its employees.

Plaintiff's first claim likewise has multiple aspects as to Sheriff Salazar. *See* FAC ¶¶ 140 (failure "to ensure" adequate medical treatment by UHS to detainees), 142 (failure to investigate UHS or "attempt to remedy" its failure to provide adequate treatment to detainees); 143 ("failure to train, discipline, and supervise Defendant UHS"), 144 ("pattern and practice of noncompliance with Texas's minimum jail standards"); 145 (failure to ensure that subordinates monitor detainees); 146-48 ("policies and practices," including failures to train and supervise, resulting in sepsis when her wrist wounds became infected because deputies did not properly monitor her and seek treatment for her). To the extent Claim 2 is asserted against Bexar County as an official capacity claim against individuals, the claim relates to Plaintiff's mental health issues, prescribed lithium, and wrist infections. Because Claim 3 has no official capacity component, it relates only to individuals not currently before the Court.

"Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's rights, privileges, or immunities secured by the Constitution and laws of the United States." *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994) (citation and internal quotation marks

omitted). "[T]here can be no § 1983 liability unless" the plaintiff has "suffered a constitutional violation . . . at the hands of . . . a state actor." *Doe ex rel. Magee v. Covington Cnty. Sch. Dist.*, 675 F.3d 849, 867 (5th Cir. 2012) (en banc).

"Accordingly, for a § 1983 claim to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), 'the plaintiff must allege that (1) a state actor, i.e., a person or entity acting under color of state law, (2) deprived the plaintiff of a federal constitutional right.'" *Alvarado v. Tex. Health & Hum. Servs. Comm'n*, No. 5:19-CV-0106-JKP, 2020 WL 4677304, at *4 (W.D. Tex. Aug. 12, 2020) (quoting *Reitz v. City of Abilene*, No. 1:16-CV-0181-BL, 2017 WL 3046881, at *11 (N.D. Tex. May 25, 2017) (recommendation of Mag. J.) *adopted by* 2017 WL 3034317 (N.D. Tex. July 17, 2017)). And, when a defendant asserts the qualified immunity defense through a motion to dismiss, a court must examine the operative pleading for "specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm alleged and that defeat a qualified immunity defense with equal specificity." *McLin v. Ard*, 866 F.3d 682, 688 (5th Cir. 2017) (citation, internal quotation marks, and ellipses omitted).

This case presents no question regarding the first element of a § 1983 action. The focus is on the second element – a constitutional deprivation. Plaintiff purports to assert an unconstitu-tional-conditions-of-confinement claim against UHS and Sheriff Salazar. She also asserts claims against Doe Defendants for episodic acts or omissions and excessive force. As highlighted earlier, Claim 1 raises several distinct legal issues as to each movant defendant. To the extent Claims 1 and 2 are asserted against the Sheriff or Doe Defendants in their official capacity, those aspects of the claims now proceed against the entity defendants for the reasons stated earlier. Because the asserted episodic claims against Doe Defendants are relevant, the Court's legal discussion will contrast episodic versus conditions claims. And to the extent Plaintiff asserts claims against Sheriff Salazar in his individual capacity, the Court will address the issue of qualified immunity as

necessary.

## A. Constitutional Deprivation

At the time of the alleged events, Plaintiff was a pretrial detainee. "In general, the State's incarceration of pretrial detainees and convicted state prisoners comports with due process guarantees because of the State's recognized interests in detaining defendants for trial and in punishing those who have been adjudged guilty of a crime." *Hare v. City of Corinth*, 74 F.3d 633, 638 (5th Cir. 1996) (en banc).[3] The power to detain or incarcerate, however, does not eliminate the constitutional responsibility "to tend to essentials of their well-being." *Id*. at 638-39. And essential "basic human needs" are "food, clothing, shelter, medical care, and reasonable safety." *Id*. at 639 (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989)).

Although the obligation to provide basic needs such as medical care is the same for both pretrial detainees and convicted prisoners, different constitutional provisions protect their rights. *Id*. "The constitutional rights of a convicted state prisoner spring from the Eighth Amendment's prohibition on cruel and unusual punishment and, with a relatively limited reach, from substantive due process." *Id*. (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). On the other hand, "[t]he constitutional rights of a pretrial detainee . . . flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment." *Id*. (citing *Bell v. Wolfish*, 441 U.S. 520

---

[3] Like much of the relevant caselaw developed over the years, *Hare* was decided at summary judgment based upon submitted evidence, rather than at the motion to dismiss stage based purely on the allegations of the operative pleadings. While much of the law remains relevant regardless of the stage of litigation, courts and litigants must be constantly aware of the differing standards applicable on a motion to dismiss versus those applied on summary judgment. At times in this Memorandum Opinion and Order, the Court may quote a case discussing what must be shown or proved instead of what must be alleged. The difference in terminology directly relates to the standard applied in the cited case and by no means is intended to mean that Plaintiff here has any obligation to make any evidentiary showing at this point. This should be obvious from the numerous instances where the Court expressly points out the differences in the standards. But in an abundance of caution, the Court emphatically states here that the standard applied on the two motions to dismiss is the standard used for motions under Fed. R. Civ. P. 12(b)(6). From the perspective of the party asserting the claim, this standard is more lenient than what is applied at summary judgment when evidentiary matters come into play. But, in general, what must be proved ultimately at summary judgment or trial must be sufficiently alleged to survive a motion to dismiss.

(1979)). Because "the State *does* punish convicted prisoners, but *cannot* punish pretrial detainees, a pretrial detainee's due process rights are said to be 'at least as great as the Eighth Amendment protections available to a convicted prisoner.'" *Id.* (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)).

Alleged violations are "characterized as a condition of confinement or as an episodic act or omission." *Garza v. City of Donna*, 922 F.3d 626, 632 (5th Cir. 2019) (citing *Hare*, 74 F.3d at 644). Both municipalities and individual officials may be liable under either theory. *See id.* (municipal liability); *Estate of Henson v. Wichita Cnty.*, 795 F.3d 456, 465 (5th Cir. 2015) (recognizing that conditions claim may be asserted against individual but declining to construe the claim in that manner as to do so would "effectively allow Plaintiffs to amend their complaint at the appellate stage"). In the Fifth Circuit, the applicable standard depends on the proper characterization of the claim under the two theories. *Henson*, 795 F.3d at 462.

For episodic violations, "the complained-of harm is a particular act or omission of one or more officials," and "an actor usually is interposed between the detainee and the municipality." *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997) (en banc). But when the complained-of harm is the "general conditions, practices, rules, or restrictions of pretrial confinement," the alleged violation is properly considered as an attack on a condition of confinement. *Hare*, 74 F.3d at 643. A party's characterization of a claim, i.e., as episodic or as conditions, is not controlling. *See Garza*, 922 F.3d at 633-34 (finding that lower court properly rejected effort to characterize claim as a conditions claim and addressing the claim as an episodic one). And "plaintiffs can bring a pretrial detainee case . . . . under alternative theories of episodic acts and omissions by individual defendants or unconstitutional conditions of confinement." *Sanchez v. Young Cnty.*, 866 F.3d 274, 279 n.3 (5th Cir. 2017) (per curiam); *accord Garza*, 922 F.3d at 633 n.3 (relying on *Sanchez*); *Henson*, 795 F.3d at 462 (recognizing that post-*Hare*, pretrial detainees may pursue alleged constitutional

violations through the two alternative theories); *Shepherd v. Dallas Cnty.*, 591 F.3d 445, 452 n.1 (5th Cir. 2009) (recognizing that plaintiffs may proceed under alternative claims based on conditions of confinement versus acts or omissions). Furthermore, while the courts may reject a particular characterization and properly characterize it, *see Garza*, 922 F.3d at 633-34, they are "no more required to classify a § 1983 lawsuit than any other case in which multiple theories are pled in the alternative," *see Shepherd*, 591 F.3d at 452 n.1.

### 1. Conditions of Confinement

For conditions-of-confinement claims, the test enunciated in *Bell v. Wolfish* "retains vitality." *See Hare*, 74 F.3d at 643. For these types of claims, "the proper inquiry is whether those conditions amount to punishment of the detainee." *Garza*, 922 F.3d at 632 (quoting *Bell*, 441 U.S. at 535). And as explained in *Hare*, "under *Bell*, a pretrial detainee cannot be subjected to conditions or restrictions that are not reasonably related to a legitimate governmental purpose." 74 F.3d at 640. "[I]f a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees." *Bell*, 441 U.S. at 539.

> In true jail condition cases, an avowed or presumed intent by the State or its jail officials exists in the form of the challenged condition, practice, rule, or restriction. A State's imposition of a rule or restriction during pretrial confinement manifests an avowed intent to subject a pretrial detainee to that rule or restriction. Likewise, even where a State may not want to subject a detainee to inhumane conditions of confinement or abusive jail practices, its intent to do so is nevertheless presumed when it incarcerates the detainee in the face of such known conditions and practices.

*Hare*, 74 F.3d at 644.

Stated differently, "[i]n cases . . .  that are grounded in unconstitutional conditions of confinement, the plaintiff need only show that such a condition, which is alleged to be the cause of a constitutional violation, has no reasonable relationship to a legitimate governmental interest."

*Duvall v. Dallas Cnty.*, 631 F.3d 203, 207 (5th Cir. 2011) (per curiam). In contrast to "an episodic-act-or-omission claim, a plaintiff is not required to prove deliberate indifference" when pursuing a conditions-of-confinement claim. *Edler v. Hockley Cnty. Comm'rs Ct.*, 589 F. App'x 664, 669 (5th Cir. 2014) (per curiam). To be unconstitutional under "*Bell*, such condition must be 'not reasonably related to a legitimate governmental objective' and must cause the inmate's constitutional deprivation." *Garza*, 922 F.3d at 632 (quoting *Henson*, 795 F.3d at 468); *accord Scott*, 114 F.3d at 53.

"A condition is usually the manifestation of an explicit policy or restriction," such as "the number of bunks per cell, mail privileges, disciplinary segregation, etc." *Shepherd*, 591 F.3d at 452 (citing *Scott v. Moore*, 114 F.3d 51, 53 n.2 (5th Cir.1997) (en banc) (listing cases deemed to be challenges to conditions of confinement)). But a "formal, written policy is not required to establish a 'condition or practice.'" *Montano v. Orange Cnty.*, 842 F.3d 865, 875 (5th Cir. 2016). Instead, "a condition may reflect an unstated or *de facto* policy, as evidenced by a pattern of acts or omissions 'sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by [jail] officials, to prove an intended condition or practice.'" *Shepherd*, 591 F.3d at 452 (quoting *Hare*, 74 F.3d at 645); *accord Garza*, 922 F.3d at 632; *Henson,* 795 F.3d at 468.

While satisfying the "condition or practice" element does not require a plaintiff to "provide specific examples of other instances of detainees who suffered [the same] fate as a result of the de facto policy . . . 'isolated examples of illness, injury, or even death, standing alone, cannot prove that conditions of confinement are constitutionally inadequate.'" *Montano*, 842 F.3d at 876 (quoting *Shepherd*, 591 F.3d at 454). Ultimately, presented evidence must be "sufficient for a reasonable juror to infer a de facto policy." *Id*. And plaintiffs have a "heavy burden" when attempting to prove a pattern. *Shepherd*, 591 F.3d at 452.

In short, to ultimately prevail on a conditions-of-confinement claim, "a plaintiff must show

a condition – a rule, an identifiable intended condition or practice, or sufficiently extended or pervasive acts or omissions of jail officials – that is not reasonably related to a legitimate governmental objective and that caused the constitutional violation." *Sanchez v. Young Cnty.*, 956 F.3d 785, 791 (5th Cir. 2020) (per curiam) (citation and internal quotation marks omitted). But courts, of course, focus on pleaded factual allegations when addressing a Rule 12(b)(6) motion to dismiss. *Parker v. Blackwell*, 23 F.4th 517, 522 (5th Cir. 2022).

### 2. Episodic Act or Omission

In contrast to a condition-of-confinement claim, when a pretrial detainee's claim is based on a jail official's episodic acts or omissions, the *Bell* test is inapplicable, and hence the proper inquiry is whether the official had a culpable state of mind in acting or failing to act." *Hare*, 74 F.3d at 643. For episodic claims, "the question is whether th[e] official breached his constitutional duty to tend to the basic human needs of person in his charge." *Id*. at 645. Notably, [w]hen a pretrial detainee's constitutional claim is based on particular acts or omissions by one or more jail officials, the difficult question is whether the challenged act or omission can be characterized as episodic." *Id*. As discussed in prior section, in some circumstances, a pattern of acts or omissions may be enough to characterize the claim as one based on the conditions of confinement. *See Shepherd*, 591 F.3d at 452.

The Fifth Circuit has established "deliberate indifference" as "the measure of culpability for [claims properly characterized as] episodic acts or omissions." *Hare*, 74 F.3d at 643. In clarifying that measure of culpability, the en banc Fifth Circuit emphasized that it was not "scal[ing] back the constitutional rights of pretrial detainees . . . because a proper application of *Bell*'s reasonable-relationship test is functionally equivalent to a deliberate indifference inquiry." *Id*. *Hare* reiterated this point for emphasis:

> Application of a deliberate indifference standard to claims by pretrial detainees is
> consistent with our cases and the dictates of *Bell*, because the deliberate indiffer-

ence standard does not impose a higher burden on pretrial detainees than the *Bell* test. Properly understood, the *Bell* test is functionally equivalent to a deliberate indifference inquiry.

*Id*. at 646. Further,

> [f]inding no constitutionally significant distinction between the rights of pretrial detainees and convicted inmates to basic human needs, including medical care and protection from violence or suicide, [the Circuit] conclude[d] that a state jail official's constitutional liability to pretrial detainees for episodic acts or omissions should be measured by a standard of subjective deliberate indifference as enunciated by the Supreme Court in [*Farmer v. Brennan*, 511 U.S. 825 (1994)].

*Id*. at 643. *Hare* also reiterated this important point just before making it express holding

> that the episodic act or omission of a state jail official does not violate a pretrial detainee's constitutional right to be secure in his basic human needs, such as medical care and safety, unless the detainee demonstrates that the official acted or failed to act with deliberate indifference to the detainee's needs.

*See id*. at 647-48. The Fifth Circuit later explained that the reasonable relationship

> standard is "functionally equivalent to a deliberate indifference inquiry, because, in a true jail conditions case, the plaintiff has shown either an official policy, intentionally adopted, or a series of "acts or omissions . . . sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by other officials, to prove an intended condition."

*Shepherd v. Dallas Cnty.*, 591 F.3d 445, 455 (5th Cir. 2009) (quoting Hare, 74 F.3d at 643, 645).

Thus, "[o]nly when the plaintiff has made such a showing may the jury reasonably presume that the government acted with the requisite intent to punish." *Id*.

### 3. <u>Deliberate Indifference</u>

Two requirements must be met to be found liable under the deliberate indifference standard of *Farmer*. 511 U.S. at 834. "First, the deprivation alleged must be, objectively, 'sufficiently serious'; a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities.'" *Id*. (citations omitted). Second, because "'only the unnecessary and wanton infliction of pain implicates'" constitutional concerns, the "prison official must have a 'sufficiently culpable state of mind.'" *Id*. (citations omitted). Thus, to be liable under *Farmer*, the jail official

must know of and disregard "an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. Stated differently, the plaintiff must "show that a state official acted with deliberate indifference to a substantial risk of serious . . . harm and that injuries resulted." *Wagner v. Bay City*, 227 F.3d 316, 324 (5th Cir.2000).

"Deliberate indifference is an extremely high standard to meet." *Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001). "Although deliberate indifference is a high bar and requires egregious conduct, plaintiffs need not prove that the official acted with the intent to cause harm." *Cope v. Cogdill*, 3 F.4th 198, 207 (5th Cir. 2021), *cert. denied*, No. 21-783, 2022 WL 2347618 (June 30, 2022). In other words, deliberate indifference does not require "that officials subjectively intend that the harm occur." *Garza v. City of Donna*, 922 F.3d 626, 636 (5th Cir. 2019).

"The Fourteenth Amendment guarantees pretrial detainees a right 'not to have their serious medical needs met with deliberate indifference on the part of the confining officials.'" *Dyer v. Houston*, 964 F.3d 374, 380 (5th Cir. 2020) (quoting *Thompson v. Upshur Cnty.*, 245 F.3d 447, 457 (5th Cir. 2001)). "A serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required." *Gobert v. Caldwell*, 463 F.3d 339, 345 n.12 (5th Cir. 2006). Further, an "official acts with deliberate indifference 'only if [(A)] he knows that inmates face a substantial risk of serious bodily harm and [(B)] he disregards that risk by failing to take reasonable measures to abate it.'" *Id.* at 346 (quoting *Farmer*, 511 U.S. at 847).

"Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances." *Id.* Nor do "[a]ctions and decisions by officials that are merely

inept, erroneous, [or] ineffective." *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 420

(5th Cir. 2017) (per curiam) (quoting *Alton v. Tex. A & M Univ.*, 168 F.3d 196, 201 (5th Cir.

1999)). Similarly, a "'failure to alleviate a significant risk that [the official] should have perceived,

but did not' is insufficient to show deliberate indifference." *Domino*, 239 F.3d at 756 (quoting

*Farmer*, 511 U.S. at 838).

"Rather, the plaintiff must show that the officials 'refused to treat him, ignored his com-

plaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly

evince a wanton disregard for any serious medical needs.'" *Id.* (quoting *Johnson v. Treen*, 759

F.2d 1236, 1238 (5th Cir. 1985)); *accord*, *Cope*, 3 F.4th at 207.

> "Wanton means reckless—without regard to the rights of others. . . . Wantonly
> means causelessly, without restraint, and in reckless disregard of the rights of oth-
> ers. Wantonness is defined as a licentious act of one man towards the person of
> another, without regard to his rights; it has also been defined as the conscious failure
> by one charged with a duty to exercise due care and diligence to prevent an injury
> after the discovery of the peril, or under circumstances where he is charged with a
> knowledge of such peril, and being conscious of the inevitable or probable results
> of such failure."

*Treen*, 759 F.2d at 1238 (quoting *Smith v. Wade*, 461 U.S. 30, 39 n.8 (1983)). Notably, "deliberate

indifference exists wholly independent of an optimal standard of care." *Gobert*, 463 F.3d at 349.

## B. Municipal Liability

When a plaintiff seeks to impose liability on a municipality, other considerations come into

play. And additional considerations become relevant when the plaintiff seeks municipal liability

due to a failure to act.

### 1. In General

Section 1983 provides a means to impose liability on municipalities for violating essential

rights accorded to both pretrial detainees and convicted prisoners. *Garza v. City of Donna*, 922

F.3d 626, 632 (5th Cir. 2019) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)).

"A municipality or other local government may be liable under [§ 1983] if the governmental body

itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Monell*, 436 U.S. at 692). Importantly, "under § 1983, local governments are responsible only for 'their *own* illegal acts.'" *Id*. (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)). Municipalities cannot be found "vicariously liable under § 1983 for their employees' actions." *Id*. These same standards apply "to local government instrumentalities such as UHS, which is owned by Bexar County." *Kerr v. Salazar*, No. SA-19-CA-398-DAE, 2019 WL 2648450, at *2 (W.D. Tex. June 27, 2019).

To state a claim for municipal liability under § 1983, the plaintiff must allege that "(1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *Pena v. City of Rio Grande City*, 879 F.3d 613, 621 (5th Cir. 2018) (quoting *Hicks-Fields v. Harris Cnty.*, 860 F.3d 803, 808 (5th Cir. 2017)). A policy is the moving force when there is "a direct causal link between the municipal policy and the constitutional deprivation." *Piotrowski v. City of Houston*, 237 F.3d 567, 580 (5th Cir. 2001).

To avoid "[m]istakes in analyzing section 1983 municipal liability cases," courts should "separate the three attribution principles and consider each in light of relevant case law." *Id.* at 578. This appears especially cogent as the case proceeds through summary judgment and beyond. *See id*. (reversing jury verdict and denial of a motion for judgment as a matter of law).

An official policy "includes the decisions of a government's law-makers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick*, 563 U.S. at 61. In general, it is important for courts to disaggregate asserted policies or customs when "they express no single municipal policy but only a series of adversarial conclusions." *Piotrowski*, 237 F.3d at 581. Disaggregation is similarly warranted when each custom "concerns a discrete [municipal] program or area of decision-making, and each invokes separate aspects of the policy issue." *Id*. And finally, courts should disaggregate asserted policies

when "each alleged policy may have had a distinct impact as the moving force" for the alleged constitutional violation. *Id*. Aggregating asserted policies or customs may provide an illusion of persistent, widespread practices that are merely a series of isolated violations that provide an insufficient basis for municipal liability. *See id*.

"To proceed beyond the pleading stage, a complaint's 'description of a policy or custom and its relationship to the underlying constitutional violation . . . cannot be conclusory; it must contain specific facts.'" *Pena*, 879 F.3d at 622 (quoting *Spiller v. City of Tex. City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997)). But that does not dispense with "some suitable leniency in pleading a policy against a municipality." *Valadez v. City of San Antonio*, No. SA-21-CV-0002-JKP-RBF, 2022 WL 1608016, at *11 (W.D. Tex. May 20, 2022) (citing *Sanchez v. Gomez*, 283 F. Supp. 3d 524, 532 (W.D. Tex. 2017) (agreeing with common-sense approach endorsed in *Thomas v. City of Galveston*, 800 F. Supp. 2d 826, 842 (S.D. Tex. 2011)); *E.G. ex rel. Gonzalez v. Bond*, No. 1:16-CV-0068-BL, 2016 WL 8672774, at *5 (N.D. Tex. Sept. 9, 2016) (recommendation of Mag. J.) (same) *adopted as modified on other grounds sub nom. E.G. v. Bond*, 2017 WL 129019 (N.D. Tex. Jan. 13, 2017)). "The common-sense approach espoused in *Thomas* and other cases provides a 'balance, requiring more than boilerplate allegations but not demanding specific facts that prove the existence of a policy.'" *Id*. at *12 (quoting *Thomas*, 800 F. Supp. 2d at 844). Still, "a plaintiff must do more than describe the incident that gave rise to his injury" to plausibly "plead a practice 'so persistent and widespread as to practically have the force of law.'" *Pena*, 879 F.3d at 622 (quoting *Connick*, 563 U.S. at 61).

An episodic-act case of municipal liability presents additional considerations. *See Garza*, 922 F.3d at 634. "To establish municipal liability in an episodic-act case, a plaintiff must show '(1) that the municipal employee violated the pretrial detainee's clearly established constitutional rights with subjective deliberate indifference; and (2) that this violation resulted from a municipal

policy or custom adopted and maintained with objective deliberate indifference.'" *Id.* (quoting *Brumfield v. Hollins*, 551 F.3d 322, 331 (5th Cir. 2008)). The first element requires that there be "an underlying violation by the state official." *Estate of Henson v. Wichita Cnty.*, 795 F.3d 456, 467 n.4 (5th Cir. 2015). Absent a "show[ing] that the state official acted with subjective deliberate indifference," claims for municipal liability ultimately fail. *Id.* The first element concerns whether there has been a violation of due process, whereas the second element is required to hold the "municipality accountable for that due process violation." *Hare v. City of Corinth*, 74 F.3d 633, 649 n.4 (5th Cir. 1996) (en banc).

### 2. **Failure to Act**

In 1989, the Supreme Court definitively held that municipalities may be liable under 42 U.S.C. § 1983 for constitutional violations resulting from their failures to train municipal employees. *See City of Canton v. Harris*, 489 U.S. 378, 385-86 (1989). The Fifth Circuit has applied the same principles to other failures to act. *See Hinojosa v. Butler*, 547 F.3d 285, 296 (5th Cir. 2008) (failure to supervise); *Milam v. City of San Antonio*, 113 F. App'x 622, 628 (5th Cir. 2004) (failures to supervise and discipline); *Piotrowski v. City of Houston*, 237 F.3d 567, 581-82 (5th Cir. 2001) (interrelated failures to discipline and investigate). An inadequate investigation may be indicative of a municipal policy or custom of inadequate discipline. *Piotrowski*, 237 F.3d at 582.

"All failure to act claims, such as Plaintiff's failure to train, supervise, and discipline claims, involve the same basic elements: inadequacy, deliberate indifference, and causation." *Snow v. City of El Paso*, 501 F. Supp. 2d 826, 833 n.5 (W.D. Tex. 2006); *accord Gonzalez ex rel. E.G. v. Bond*, No. 1:16-CV-0068-BL, 2017 WL 3493124, at *4 (N.D. Tex. June 29, 2017) (recommendation of Mag. J.) *adopted by* 2017 WL 3491853 (N.D. Tex. Aug. 14, 2017)). Indeed, the Fifth Circuit does not differentiate between failure to train and failure to supervise claims when discussing such claims. *See Parker v. Blackwell*, 23 F.4th 517, 525 (5th Cir. 2022); *Culbertson v. Lykos*,

790 F.3d 608, 625 (5th Cir. 2015) (same). And such claims may be asserted against a Sheriff in his individual capacity, *see Parker*, 23 F.4th at 525 (addressing such claims in qualified immunity context) or official capacity, *see Medina v. Ortiz*, 623 F. App'x 695, 700 (5th Cir. 2015) (per curiam) (addressing official capacity claim and noting that the suit is in actuality against the entity the Sheriff represents), or against the municipality itself, *see Pena v. City of Rio Grande City*, 879 F.3d 613, 621 (5th Cir. 2018).

Of course, as recognized in the prior section, municipalities "are not liable for constitutional violations committed by [municipal] employees unless those violations result directly from a municipal custom or policy." *Sanders-Burns v. City of Plano*, 594 F.3d 366, 380 (5th Cir. 2010). Thus, in the municipality context, a failure to act claim must have (1) an inadequate policy (2) that was adopted with deliberate indifference and (3) directly caused the alleged injury. *See id*. at 381. Stated similarly in the individual capacity context:

> A failure to supervise or train claim arises when the plaintiff shows that (1) the defendant failed to supervise or train the alleged bad actor, (2) there is a causal connection between the infringement of the plaintiff's constitutional rights and the lack of supervision or training, and (3) the failure to supervise or train exhibited deliberate indifference to the plaintiff's constitutional rights.

*Parker*, 23 F.4th at 525. This same standard applies to alleged failures to train asserted against a municipality. *See Pena*, 879 F.3d at 623. A failure to discipline claim likewise requires a causal link, deliberate indifference, and inadequate discipline. *Piotrowski*, 237 F.3d at 581. As stated in *Piotrowski*, a municipal "policy of inadequate officer discipline could be unconstitutional if it was pursued with deliberate indifference toward the constitutional rights of citizens." *Id.*

As the Supreme Court has explained, "[i]n limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). But "culpability for a deprivation of rights is at its most tenuous where a

claim turns on a failure to train." *Id*. "That statement equally applies to claimed failures to supervise and discipline." *Gonzalez*, 2017 WL 3493124, at *4.

For § 1983 purposes, a municipality's failure to act "in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [municipal employees] come into contact.'" *Connick*, 563 U.S. at 61 (quoting *Canton*, 489 U.S. at 388 in context of failure to train). Only through deliberate indifference "can such a shortcoming be properly thought of as a [municipal] 'policy or custom' that is actionable under § 1983." *Id*. (quoting *Canton*, 489 U.S. at 389). And "'deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997).

> To demonstrate deliberate indifference, a plaintiff must show that "in light of the duties assigned to specific officers or employees, need for more or different training is obvious, and the inadequacy so likely to result in violations of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."

*World Wide St. Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 756 (5th Cir. 2009) (quoting *Canton*, 489 U.S. at 390). "A less stringent standard of fault for a failure-to-[act] claim 'would result in *de facto respondeat superior* liability on municipalities . . . .'" *Connick*, 563 U.S. at 62 (quoting *Canton*, 489 U.S. at 392).

Notably, "the plaintiff must plead facts sufficient to show the municipality was 'deliberately indifferent' to the obvious need [to act]." *Culbertson*, 790 F.3d at 625 (quoting *Peterson v. City of Fort Worth*, 588 F.3d 838, 849-50 (5th Cir. 2009)). The alleged "infringement of the plaintiff's constitutional rights must be an 'obvious' and 'highly predictable' consequence of the failure to [act]." *Parker*, 23 F4th at 525 (quoting *Culbertson*, 790 F.3d at 625). As stated in *Peterson*, a "failure to train can amount to a policy if there is deliberate indifference to an obvious need for training where citizens are likely to lose their constitutional rights on account of novices in [their

respective field].” 588 F.3d at 849 (discussing novices in law enforcement). The same is true when there is deliberate indifference to an obvious need for supervision or discipline where citizens are likely to lose their constitutional rights on account of unsupervised or undisciplined municipal employees.

While a “single incident can give rise to municipal liability,” it can do so “only if the municipal actor who committed the constitutional violation ‘is a final policymaker.’” *Medina*, 623 F. App’x at 700 (quoting *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010)). “Because the ‘standard for [municipal] fault’ is a ‘stringent’ one, ‘[a] pattern of similar constitutional violations by untrained employees is ordinarily’ required to show deliberate indifference.” *Pena*, 879 F.3d at 623 (quoting *Connick*, 563 U.S. at 62). The same can be said about unsupervised municipal employees. Similarly, it is nearly impossible to impute lax disciplinary policy to [a municipality] without showing a pattern of abuses that transcends the error made in a single case.” *Piotrowski*, 237 F.3d at 582 (citing *Bryan Cnty.*, 520 U.S. at 410-11). Thus, relief is typically unavailable “absent a showing of a pattern of constitutional violations, as opposed to a single incident.” *Parker*, 23 F4th 525. “A pattern could evidence not only the existence of a policy but also official deliberate indifference.” *Piotrowski*, 237 F.3d at 582.

A pattern is ordinarily necessary because a pattern provides notice to the municipality and its policymakers of a need to remedy a deficient training program, *Connick*, 563 U.S. at 62, or to address deficient supervision or discipline. A “continued adherence to an approach that [municipal decisionmakers] know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the ‘deliberate indifference’—necessary to trigger municipal liability.” *Bryan Cnty.*, 520 U.S. at 407; *accord Connick*, 563 U.S. at 62. “Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause

violations of constitutional rights." *Connick*, 563 U.S. at 62. Similar notice deficiencies affect whether a municipality deliberately pursues supervisory or disciplinary choices. And "contemporaneous or subsequent conduct cannot establish a pattern of violations that would provide 'notice to the [municipality] and the opportunity to conform to constitutional dictates . . .." *Id*. at 63 n.7 (quoting *Canton*, 489 U.S. at 395 (O'Connor, J., concurring in part and dissenting in part)).

"In *Canton*, the [Supreme] Court left open the possibility that, 'in a narrow range of circumstances,' a pattern of similar violations might not be necessary to show deliberate indifference." *Id*. at 63. It "sought not to foreclose the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Id*. at 64.

But in *Connick*, the Supreme Court closed the door to that possibility for a failure to train prosecutors with respect to specific legal training in light of a noted regimen of legal training and professional responsibility applicable to attorneys. *See* 563 U.S. at 64-68. With respect to legal training in particular, the Supreme Court noted:

> Attorneys are trained in the law and equipped with the tools to interpret and apply legal principles, understand constitutional limits, and exercise legal judgment. Before they may enter the profession and receive a law license, all attorneys must graduate from law school or pass a substantive examination; attorneys in the vast majority of jurisdictions must do both. These threshold requirements are designed to ensure that all new attorneys have learned how to find, understand, and apply legal rules.

*Id*. at 64 (citations omitted).

The overarching principle in *Connick* is that the narrow range of circumstances which may provide for single-incident liability does not encompass areas of training that the municipality should expect prior sufficient training. In such circumstances, the failure to act, i.e., train an employee, simply does not provide any "patently obvious" unconstitutional consequence that would flow from the failure. *Id*. at 63-64.

**C. Analysis**

Against this backdrop, it is clear that whether a plaintiff has alleged a plausible conditions or episodic claim is often not a simple question. The complexity increases when the plaintiff's pleading is imprecise and when the pleading presents intertwined claims for municipal and individual liability. And the task becomes that much more difficult when a party moves for dismissal through Fed. R. Civ. P. 12(b)(6) without precision.

Plaintiff's first claim unnecessarily combines two defendants while purporting to assert individual and official capacity claims against one of them. That also makes it more difficult to address the claim. Further complicating matters, the claim asserts various aspects against the two defendants, instead of asserting a single, distinct basis. Consequently, Claim 1 touches upon each of the above-discussed legal principles to some extent. Although labeled as a conditions of confinement claim, it includes episodic omissions. Despite its varied aspects, the claim appears to be primarily a claim for municipal liability based on various policies or customs. In any event, the Court will analyze all aspects of this claim as it relates to each of the movant defendants.

Plaintiff's second claim also creates unnecessary complexity by generally asserting episodic claims against unnamed employees of two distinct entities. With respect to Claim 2, she also sues the Doe Defendants in both their individual and official capacities. The Court will also consider Claim 2 as it relates to the movant defendants.

**1. UHS**

As mentioned earlier, Claim 1 has three potentially distinct aspects as it relates to UHS: (1) a policy and practice of failing to properly monitor; (2) a failure to conduct testing; and (3) a failure to train and supervise subordinates. And to the extent Claim 2 is asserted as an official capacity claim against UHS employees, it also relates to UHS.

While UHS presents numerous arguments for why the First Amended Complaint fails to

state a claim under Fed. R. Civ. P. 12(b)(6), two warrant consideration at the outset: (1) Plaintiff has failed to allege facts to establish that the alleged constitutional deprivation was due to deliberate indifference instead of mere negligence and (2) Plaintiff complains about medical decisions that are beyond its control because Texas law restricts the practice of medicine to licensed physicians and because it does not employ any physicians.

As mentioned once before, who UHS actually employs is beyond the scope of a motion to dismiss when the Plaintiff has alleged that UHS personnel failed to take certain actions. Because Plaintiff has provided factual allegations that UHS personnel were involved in the deprivation of her constitutional rights, the Court accepts those allegations as true. No amount of argument will change those allegations. While such argument may have merit at summary judgment, assuming UHS can produce supporting evidence, UHS chose to seek dismissal through Rule 12(b)(6) and its accompanying standard.

As to the argument regarding negligence and deliberate indifference, UHS ignores the manner in which Plaintiff pleads Claim 1 against it – as a challenge to the conditions of her confinement. Undoubtedly, mere negligence by a jail official does not suffice. But the focus must be on the claim asserted and the factual allegations made within the operative pleading. For a true conditions of confinement claim, one may presume intent, *Hare v. City of Corinth*, 74 F.3d 633, 644 (5th Cir. 1996) (en banc), thus dispensing with the deliberate indifference requirement. In such circumstances, the proper focus is on whether the alleged unconstitutional condition has any reasonable relationship to a legitimate governmental interest. *Duvall v. Dallas Cnty.*, 631 F.3d 203, 207 (5th Cir. 2011) (per curiam). Of course, deliberate indifference is a required element for any failure to act claim asserted against a municipality, *Sanders-Burns v. City of Plano*, 594 F.3d 366, 381 (5th Cir. 2010), and any episodic-act case of municipal liability, *see Garza v. City of Donna*, 922 F.3d 626, 634 (5th Cir. 2019).

In this case, neither UHS nor Plaintiff completely differentiate between the various aspects of the claims asserted against UHS. But as *Piotrowski* instructs, parties should disaggregate distinct policies or customs so that they are properly considered by the courts. And when parties fail to do so, they make judicial consideration more difficult.

Here, the first and third aspects of Claim 1 clearly relate to distinct customary policies. And a fair reading of the second listed aspect connects it to the monitoring policy – as alleged by Plaintiff, testing blood-lithium levels is part of the monitoring necessary for bipolar detainees. This reading is further supported by Plaintiff not framing the second aspect as a distinct policy.

Because Plaintiff seeks to impose municipal liability based on a conditions of confinement theory, she must allege an official policy that directly caused her alleged constitutional deprivation. *See Pena v. City of Rio Grande City*, 879 F.3d 613, 621 (5th Cir. 2018); *Piotrowski v. City of Houston*, 237 F.3d 567, 580 (5th Cir. 2001). In general, a municipal policy becomes official through "decisions of a government's law makers" or "acts of its policymaking officials." *See Connick v. Thompson*, 563 U.S. 51, 61 (2011). But a customary policy may also be accorded official status through "practices so persistent and widespread as to practically have the force of law." *See id*. In this latter circumstance, there is no need for independent action by government lawmakers or policymaking officials and promulgation by a policymaker is subsumed within the requirement that the policy be official. *See id.*

Plaintiff does not rely on an express or explicit written policy for any aspect of Claim 1. Although she does attach and rely on written policy and training documents of UHS, she does so to highlight that the written policies lack guidance and instruction regarding monitoring patients like her. *See* FAC ¶¶ 93-95, ECF No. 21-1 (Ex. 1 to FAC). Nor is there any allegation that there is a specific rule or restriction that limits monitoring, testing, training, or supervising.

Instead, through alleged failures to monitor or test, Plaintiff pursues Claim 1 either through

an identifiable intended condition or practice or through sufficiently extended or pervasive omissions. She makes numerous allegations that conditions at the Jail fail to satisfy minimum medical and health services required by Texas law. *See* FAC ¶¶ 115-29. As support, she attaches an inspection report from the TCJS dated February 2019, which shows several deficiencies at the Jail, including failures to conduct periodic visual checks of detainees. *See* ECF No. 21-2 (Ex. 2).

The Court previously viewed similar allegations as "troubling," but on the facts alleged in the prior case, found no indication "that any failure to provide [the detainee] medical care was due to the act or omission of a Bexar County correctional officer or due to general conditions, practices, rules, or restrictions of the Bexar County Jail." *Ule v. Bexar Cnty. Hosp. Dist.*, No. 5:19-CV-01459-JKP-ESC, 2020 WL 5644930, at *8 (W.D. Tex. Sept. 22, 2020). Additionally, this Court found no alleged facts to "show a policy, pattern, or practice of the Jail caused the violation of [the detainee's] constitutional rights." *Id.*

Notably, in their reply brief in this case, the County Defendants contend that the Court recognized in *Ule* that the "TCJS infractions . . . were cured," *see* ECF No. 31 at 3, but no such recognition is apparent from the *Ule* decision, *see*, *generally*, 2020 WL 5644930, at *1-10. The County Defendants read more into *Ule* than is there. That the Court found the facts alleged there insufficient does not dictate a result here. Rulings on motions to dismiss are extremely fact dependent and a ruling in one case based on different factual allegations may not support the same ruling in a later case.

But the County Defendants in this case do provide a Re-Inspection Report with their motion which shows that the deficiencies noted in February 2019 did not exist as of November 2019. *See* ECF No. 23-1 at 1-2. The Court has accepted this document under Fed. R. Evid. 201(b) and may use it with respect to either pending motion to dismiss. In light of this Re-Inspection Report, the earlier inspection report may have less relevancy as to jail conditions existing when Plaintiff

was detained in November and December 2020. The earlier deficiencies, nevertheless, remain relevant to her allegations of extended or pervasive omissions. Whether the infractions were completely cured before Plaintiff's detention is a matter beyond the scope of the current motions to dismiss. Of course, any such curing would be relevant on summary judgment.

Plaintiff also alleges that several detainees have died while in custody at the Jail., and two died in December 2021. *See* FAC ¶¶ 130-33. One of these latter deaths was a suicide and the other was following a "medical episode prior to being discovered unresponsive." *Id*. ¶¶ 132-33. Absent allegations to connect any of these deaths to any alleged customary policy, the allegations of these deaths merely allege a series of isolated violations that do not provide a basis for municipal liability. But Plaintiff does attempt to connect these alleged deaths to a pattern and practice of not complying with minimum jail standards imposed by Texas law, including alleged failures to properly supervise and monitor pretrial detainees. *See*, *generally*, *id*. ¶¶ 108-33.

Moreover, the alleged failures to test and monitor both relate to an alleged denial of medical care by UHS. On the facts alleged, the Court may reasonably infer from the alleged failures to test blood-lithium levels that such failures are encompassed by the broader alleged failure-to-monitor policy. The failure to monitor aspect allegedly goes well beyond the specifics of Plaintiff's detention. Plaintiff has sufficiently pled an official customary policy that may provide a basis for municipal liability against UHS. She has plausibly pled a practice that satisfies the official policy element through persistent and widespread omissions. Although this type of alleged official policy subsumes the policymaker issue, Plaintiff must still allege that the policy caused her constitutional violation. *See Connick*, 563 U.S. at 60. And she has made sufficient allegations that the denial of medical care related to her lithium toxicity directly resulted from the monitoring policy of UHS.

For her § 1983 claim against UHS, Plaintiff has alleged an unconstitutional condition through the official customary policy alleged to have existed based upon persistent and widespread

failures to monitor detainees. She has alleged that such condition caused the constitutional denial of medical care. And, although neither party addresses the reasonable-relationship issue, the Court, for purposes of the instant motions to dismiss, may reasonably infer from Plaintiff's allegations that the alleged monitoring and testing policy is not reasonably related to a legitimate governmental purpose.

Given allegations as to the known nature of Plaintiff's mental condition, the powerfulness of the prescribed medication (lithium), a need for precision as to dosage, and the need for immediate attention when signs of lithium toxicity appear, the Court may infer from the alleged failures to monitor and test that the challenged condition manifests an intent to subject the detainee to the condition. For a true conditions of confinement claim, intent is presumed from the presence of the challenged practice or condition – there is no need to present factual allegations as to deliberate indifference. But there must be allegations that the condition caused a constitutional violation. Plaintiff provides enough factual allegations in that regard.

To the extent the Court were to construe Claim 1 as an episodic-act-or-omission claim against UHS, the FAC must include sufficient factual allegations to show deliberate indifference. Plaintiff, furthermore, specifically characterizes Claim 2 as an episodic claim while asserting it against UHS through its official capacity component.

In the "twofold analysis" for deliberate indifference, the first step requires sufficient allegations of "objective exposure to a substantial risk of serious harm." *See Gobert v. Caldwell*, 463 F.3d 339, 345 (5th Cir. 2006). Based on the allegations of Plaintiff, she was objectively exposed to a substantial risk of serious harm when UHS personnel failed to test her blood-lithium level when prescribing lithium and while she continued to ingest it without testing or adequate monitoring. But she makes no allegation that the failure to test was done with any subjective deliberate indifference. And her specific allegation of deliberate indifference with respect to the policy and

practice of failing to properly monitor detainees lies only with UHS's failure to promulgate and implement different policies and practices. Nevertheless, through Claim 2, Plaintiff has alleged that Doe Defendants ignored her complaints and were deliberately indifferent to her serious medical needs. *See* FAC ¶¶ 150, 152. She further contends that as a direct result she suffered lithium poisoning and sepsis, a life-threatening condition. *See id.* ¶ 151, 153. She has alleged enough factual allegations for an episodic claim to proceed further.

Deliberate indifference is likewise a required element to assert a failure to train or supervise claim. There must also be allegations that the municipality failed to supervise or train an alleged bad actor and a causal connection between the failure to act and the infringement on the detainee's constitutional rights. As to the failure to supervise, Plaintiff merely mentions such failure in passing and does not allege any connection between a lack of supervision and the alleged violation of her right to adequate medical care. Standing alone, the failure to supervise claim fails to state a claim upon which the Court can grant relief.

On the other hand, the failure to train claim alleges a connection between the failure to train and alleged constitutional violation. And Plaintiff alleges a customary policy regarding training. She makes allegations that go beyond her own detention, so she is not relying on a single incident to impose liability. Plaintiff had a known serious medical need. UHS treated it with lithium without testing blood-lithium levels even though the nature of the drug allegedly requires precise dosage and a need for immediate attention upon appearance of signs of lithium toxicity. And despite that treatment, UHS allegedly failed to monitor Plaintiff and her blood-lithium levels despite the newly prescribed medication. Plaintiff also alleges that the need for training is obvious given the alleged facts. On these alleged facts, the Court finds sufficient factual allegations to plausibly find that UHS was deliberately indifferent to an obvious need to train employees as to monitoring detainees on new prescriptions.

In summary, the purported conditions of confinement claim asserted against UHS survives the motion to dismiss except to the extent Plaintiff asserts a failure to supervise claim separate and distinct from the failure to train claim. As to Claim 1 against UHS, Plaintiff has otherwise provided sufficient factual allegations to survive UHS's motion to dismiss. The claim survives as a true conditions claim. From her amended complaint, the Court may reasonably infer that the alleged monitoring policy and practice is not reasonably related to a legitimate governmental purpose. Her factual allegations are enough to state a conditions claim for municipal liability against UHS. The failure to train claim likewise survives. And to the extent the conditions claim can be construed as an episodic claim it survives along with the official capacity component of Claim 2.

The Court briefly touches upon other asserted arguments of UHS for why Plaintiff has not stated a § 1983 claim upon which relief can be granted. First, as to UHS, each aspect of Claim 1 relates to Plaintiff's mental health issues and prescribed lithium. Thus, arguments regarding excessive force, *see* ECF No. 22 at 8, are not relevant to Claim 1 as it pertains to UHS. Even as to Claim 2, Plaintiff's allegations regarding excessive force are limited to deputies and non-UHS personnel. With respect to UHS, the Court has no need to address arguments regarding excessive force.

UHS contends that "Plaintiff's allegations are characterized by sweeping generalizations and overly broad and conclusory statements." *Id*. at 4. While Plaintiff could have improved the First Amended Complaint in various respects, UHS overstates its contention. It also asserts that Plaintiff merely alleges that it "somehow mistreated" her. *Id*. But she alleges much more than that.

UHS quarrels with the amount of detail Plaintiff provides in her FAC. *See id.* at 4-5. This is not the first time UHS has argued that a plaintiff's complaint was deficient for what care should have been provided or how the failure caused injury. *See Dotson v. Bexar Cnty. Hosp. Dist.*, No. SA-19-CV-00083-XR, 2019 WL 6311375, at *5 (W.D. Tex. Nov. 25, 2019). And, as in *Dotson*,

the Court disagrees that the operative pleading here is deficient for the reasons argued. As to what care should have been provided, it is apparent from the FAC that UHS should have monitored Plaintiff's health condition and the failure to do so is constitutionally deficient medical care. Similarly, the FAC states that UHS and its employees were deficient with testing blood-lithium levels. UHS sets out a litany of matters that are absent from the amended complaint. *See* ECF No. 22 at 4-5. But, at the motion to dismiss stage, more detail is not required. And, as to how UHS's failures were the proximate cause of Plaintiff's injuries, Plaintiff has stated enough allegations for claims to survive the motion to dismiss.

UHS argues that, because all of Plaintiff's "complaints about medical decisions made by physicians at Detention Healthcare Services and University Hospital are essentially complaints about the exercise of medical judgments and constitute the practice of medicine," they "do not support an actionable claim" under § 1983. ECF No. 22 at 6. This argument ignores both the context of asserted claims and the current procedural posture, i.e., the motion to dismiss stage, with its associated requirement to view alleged facts as true and construing all reasonable inferences in the light most favorable to the Plaintiff. At summary judgment the parties may fully explore this argument.

### 2. **Sheriff Salazar/Bexar County**

Claim 1 asserted against Sheriff Salazar encompasses the following failures: (1) ensure that UHS provides adequate medical treatment to detainees; (2) investigate UHS and attempt to remedy UHS's failure to provide adequate medical treatment; (3) train, discipline, and supervise Defendant UHS; (4) comply with Texas's minimum jail standards, including failures to ensure that subordinates conduct periodic checks of detainees; and (5) train and supervise deputies regarding monitoring detainees and timely seeking medical care for them. *See* FAC 140-47. And she asserts that, through the Sheriff's "policies and practices," he directly caused her to suffer sepsis after her wrists

became infected. *See id.* ¶ 148. Because Plaintiff brings only this one claim against the Sheriff and because she sues him in both his individual and official capacities, it is apparent that she brings this claim against him in both capacities. But that does not mean that Plaintiff brings each aspect of Claim 1 against the Sheriff in both capacities. Plaintiff also effectively sues Bexar County for the alleged episodic claim against the Doe Defendants (Claim 2) through the official capacity component of the claim.

Plaintiff premises the first aspect of Claim 1 on the Sheriff's alleged ultimate responsibility for detainees at the Jail. But such "allegations are too tenuous to support a conditions of confinement claim for failure to provide medical care against Sheriff Salazar." *Ule v. Bexar Cnty. Hosp. Dist.*, No. 5:19-CV-01459-JKP-ESC, 2020 WL 5644930, at *9 (W.D. Tex. Sept. 22, 2020). The Court must look beyond such a general allegation and consider specifically alleged conduct of officers or personnel employed by the Sheriff. *See id.* Through this aspect of Claim 1, Plaintiff essentially seeks to hold Bexar County and the Sheriff liable on a theory of vicarious or respondeat-superior liability, which simply is not permitted for official or individual capacity claims. *See Connick v. Thompson*, 563 U.S. 51, 62 (2011) (discussing standard to be applied in municipal liability claims and noting that a lesser standard "would result in *de facto respondeat superior* liability"); *Magnolia Island Plantation, LLC v. Whittington*, 29 F.4th 246, 251 (5th Cir. 2022) (addressing personal involvement requirement for § 1983 liability in individual capacity). This aspect relates to failures of others in providing adequate medical care. And from an official capacity/municipality standpoint, furthermore, there is no reliance on any policy or practice. The Court will not further consider this aspect of Claim 1.

The third aspect requires consideration of what control, if any, that the Sheriff or Bexar County has over UHS and its employees. As a matter of law, UHS is a separate and distinct entity from Bexar County. *See Rodriguez v. Bexar Cnty.*, No. SA-18-CV-248-XR, 2018 WL 4431433,

at *3 (W.D. Tex. Sept. 17, 2018). The Court may consider this "purely legal matter" on a motion to dismiss. *See id*. But the party moving to dismiss has the burden to show a legal deficiency sufficient to warrant dismissal. *See* 5B Charles Alan Wright et al., Federal Practice and Procedure § 1357 (3d ed. Apr. 2022 update) ("All federal courts are in agreement that the burden is on the moving party to prove that no legally cognizable claim for relief exists.").

Relying on the separate entity status, the County Defendants assert that "Plaintiff does not explain what supervisory or disciplinary authority she contends Sheriff Salazar should have exercised over UHS." ECF No. 23 at 7 n.3. But Plaintiff has no obligation to set out such an explanation to avoid dismissal under Rule 12(b)(6). "Plaintiffs have no burden of proof" with respect to a Rule 12(b)(6) motion. *Preston v. Seterus, Inc.*, 931 F. Supp. 2d 743, 751 (N.D. Tex. 2013). With that said, however, the Court does not find any basis from the operative pleading for reasonably inferring that either Bexar County or the Sheriff has authority to train, discipline, or supervise a separate legal entity such as UHS. The Court will not further consider the third aspect of Claim 1 as asserted against the Sheriff.

With the control issue resolved for now, the Court considers whether the official capacity component of Claim 2 or any remaining aspect of Claim 1 suffice to state a claim against either the Sheriff in his individual capacity or Bexar County through asserted official capacity claims.

### a. <u>Bexar County (Official Capacity Claim Against Sheriff)</u>

Because an official capacity claim is effectively against the municipality, such a claim requires allegations of an official policy. As Claim 1 relates to the Sheriff and Bexar County, only the third and fifth aspects mention any policy. The Court has already resolved the first and third aspects for the County Defendants. The second aspect necessarily fails to state a claim for municipality liability for lack of any policy allegation. Further, although a failure to investigate may be indicative of a municipal policy or custom of inadequate discipline, the alleged failure to investi-

gate UHS, a separate legal entity, is too tenuous to indicate any policy or custom. Additionally, it is too tenuous to be a direct cause of Plaintiff's alleged constitutional violation. The Court thus finds insufficient allegations for the second aspect to state a plausible claim against Bexar County.

The fourth aspect asserts a pattern and practice of the Sheriff failing to comply with Texas standards relating to detainees with mental health issues. Although § 1983 provides no basis to impose liability for mere violations of state law or regulations, *see Bush v. Viterna*, 795 F.2d 1203, 1204 (5th Cir. 1986) (affirming dismissal of claim characterized as "an illegitimate effort to seek federal enforcement of state law"), a violation of state law suffices for purposes of § 1983 to the extent state law parallels federal law, *see Magnolia Island Plantation, LLC v. Whittington*, 29 F.4th 246, 251 (5th Cir. 2022) (recognizing that a violation of the Louisiana constitution is subject to qualified immunity). Furthermore, some alleged violations of the Sandra Bland Act may support alleged constitutional violations under 42 U.S.C. § 1983. *See Macias v. Bexar Cnty.*, No. SA-21-CV-00193-JKP, 2021 WL 4953905, at *5-10 (W.D. Tex. Oct. 25, 2021) (discussing the Act in various claim contexts).

This Texas Act amended several state codes "by providing increased protections for detainees with mental health issues." *See id*. at *5. Allegations that jail officials, including the Sheriff, "knew of the Act's requirements allows" a court "to draw the reasonable inference that [the defendants] knew detainees should be evaluated for mental health care needs." *Id*. Although the alleged facts here concern a failure to monitor detainees with mental health needs, rather than a failure to evaluate them, both types of failures can state a constitutional violation related to denial of medical care. Here, Plaintiff has alleged that Sheriff Salazar received written notice of the requirements of the Sandra Bland Act. *See* FAC ¶¶ 108-11. As discussed with respect to Defendant UHS, Plaintiff has alleged enough facts for her alleged monitoring policy to survive dismissal at this point. A similar policy as to Bexar County likewise survives.

The fifth aspect concerns alleged failures to train and supervise deputies regarding monitoring detainees and timely seeking medical care. Plaintiff has made sufficient factual allegations with respect to the alleged failure to train. *See id*. ¶¶ 146-48. Given the interrelationship between Bexar County and UHS, Plaintiff pursues this aspect of Claim 1 through the same or similar identifiable intended condition or practice or through sufficiently extended or pervasive omissions. Although Plaintiff had a known serious medical need as shown by the obvious infection of her wrist wounds, deputies did not timely seek medical care. She alleges a connection between the failure to train and alleged constitutional violation. She alleges a customary policy regarding training. She makes allegations that go beyond her own detention, so she is not relying on a single incident to impose liability. There is no need to revisit the reasoning that supports allowing this aspect of Claim 1 to proceed. The reasoning stated with respect to the failure to train claim asserted against UHS supports the similar failure asserted against Bexar County. But, as with her failure to supervise claim against UHS, her failure to supervise claim against Bexar County has insufficient facts to continue.

For the foregoing reasons, as to Bexar County, only the fourth and fifth aspects of Claim 1 survive, and the fifth aspect survives only as to the alleged failure-to-train policy. All other aspects do not survive the motion to dismiss.

### b. **Bexar County (Official Capacity Component of Claim 2)**

For the reasons stated with respect to the official capacity component of Claim 2 as applied to Defendant UHS, the episodic act claim survives dismissal at this point. There is no need to further elaborate.

### c. **Individual Claims Against Sheriff**

The Court next considers Claim 1 as it is asserted against Sheriff Salazar in his individual capacity. Individual capacity claims usually invoke consideration of qualified immunity. And

Plaintiff addresses qualified immunity components in a general manner. *See* ECF No. 29 at 5 (discussing clearly established law and deliberate indifference). But she does not expressly identify the extent of her individual capacity claim.

As briefly mentioned above, "[s]ection 1983 does not impose vicarious or respondeat-superior liability." *Magnolia Island Plantation, LLC v. Whittington*, 29 F.4th 246, 251 (5th Cir. 2022) (quoting *Bigford v. Taylor*, 834 F.2d 1213, 1220 (5th Cir. 1988)). Therefore, an official, like the Sheriff, "cannot be held liable in his individual capacity merely because a subordinate committed some constitutional violation." *Id*. To be subject to individual liability, an official "must either be 'personally involved in the constitutional violation' or commit 'acts [that] are causally connected to the constitutional violation alleged.'" *Id*. (quoting *Anderson v. Pasadena Indep. Sch. Dist.*, 184 F.3d 439, 443 (5th Cir. 1999)). Stated differently, "a 'supervisor is not personally liable for his subordinate's actions in which he had no involvement.'" *Id*. (quoting *James v. Tex. Collin Cnty.*, 535 F.3d 365, 373 (5th Cir. 2008)). At this stage, Plaintiff's operative pleading must contain allegations of some personal involvement of Sheriff Salazar in the alleged constitutional violation.

The Court has already resolved the first aspect for the County Defendants whether asserted against the Sheriff in his official or individual capacities. The second aspect, i.e., failure to investigate, may be premised on personal involvement of the Sheriff but is too attenuated to be connected to the alleged denial of medical care to Plaintiff. On the facts alleged, Plaintiff has not stated a plausible failure to investigate claim sufficient to impose liability on the Sheriff in his individual capacity. Similarly, Plaintiff has stated insufficient factual allegations regarding the Sheriff's personal involvement in the failures to train, discipline, and supervise that form the basis for the third aspect of Claim 1.

And the alleged failure to comply with Texas standards is pled as a "pattern and practice of noncompliance." *See* FAC ¶ 144. This allegation does not sufficiently allege personal

involvement of the Sheriff in any denial of medical care to Plaintiff. Furthermore, Fifth Circuit "precedent suggests that municipalities, not individuals, should generally be held liable for city policies." *Cope v. Cogdill*, 3 F.4th 198, 211 (5th Cir. 2021), *cert. denied*, No. 21-783, 2022 WL 2347618 (U.S. June 30, 2022). Although Plaintiff asserts that she sues the Sheriff in both his official and individual capacities, *see* FAC ¶ 8, she makes no attempt to allege his involvement outside his official capacity as Sheriff. Her response to the motion to dismiss does not differentiate between the Sheriff and Bexar County as to this alleged pattern and practice. *See* ECF No. 29 at 15. To the extent this allegation relates to municipal liability, the Court has considered it in that context.

Likewise, Plaintiff also pleads the alleged failures to train and supervise deputies as a municipal liability claim. *See* FAC ¶ 147. While a failure to act claim may be pursued against the Sheriff individually, allegations that "are generic at best" and provide "no specific facts that rise above the speculation level" fall short of stating a failure to act claim. *Parker v. Blackwell*, 23 F.4th 517, 525 (5th Cir. 2022). Here, the County Defendants argue that Plaintiff asserts this aspect as only an official capacity claim. *See* ECF No. 23 at 12 n.7. Plaintiff does not contest that in response and the operative pleading alleges no facts regarding the Sheriff's personal involvement in the denial of medical care. She makes no attempt to allege his involvement outside his official capacity. The Court has considered these alleged failures to act in the municipality context.

Furthermore, although § 1983 does provide a basis to impose liability against a Sheriff on grounds of supervisor liability, *see Parker*, 23 F.4th at 522, Plaintiff has made insufficient allegations to rely on supervisor liability. "In order to establish supervisor liability for constitutional violations committed by subordinate employees, plaintiffs must show that the supervisor act[ed], or fail[ed] to act, with deliberate indifference to violations of others' constitutional rights committed by their subordinates." *Id.* (quoting *Wernecke v. Garcia*, 591 F.3d 386, 401 (5th Cir. 2009)).

Of course, on a Rule 12(b)(6) motion to dismiss, the focus is on whether there are enough factual allegations to "raise a facially plausible claim." *Id*. Here, Plaintiff makes no allegations that the Sheriff acted or failed to act with deliberate indifference to the alleged denial of medical care committed by his subordinates. Nothing indicates that the Sheriff knew of the alleged denial involving Plaintiff or that he responded with deliberate indifference to such denial. This is not a proper case for supervisory liability.

On summary judgment, a "Sheriff is entitled to qualified immunity" when the plaintiff is unable to "provide any evidence that the Sheriff himself violated her rights." *Magnolia Island*, 29 F.4th at 251. And on a motion to dismiss, a defendant, like the Sheriff, is entitled to qualified immunity when the operative pleading lacks sufficient factual allegations to permit a reasonable inference that the individual is liable for the harm alleged. *See McLin v. Ard*, 866 F.3d 682, 688 (5th Cir. 2017). Thus, a Sheriff is entitled to qualified immunity on a motion to dismiss absent enough factual allegations to plausibly show his personal involvement. Because Plaintiff has failed in that regard, Sheriff Salazar is entitled to qualified immunity.

### 3. Summary of Rulings on § 1983 Claims

Plaintiff has asserted three claims under 42 U.S.C. § 1983. The official capacity components of Claims 1 (against Sheriff Salazar) and 2 (against Doe Defendants of both entities) are dismissed as duplicative of claims against the entity defendants, Bexar County and UHS. Claim 1 is dismissed as asserted against Sheriff Salazar in his individual capacity. Although some aspects of Claim 1 are dismissed, Claims 1 and 2 continue to proceed against both entities as stated herein. Claims 2 and 3 continue to proceed against the Doe Defendants in their individual capacities. There is no official capacity component to Claim 3. And Claim 3 does not relate to Defendant UHS or its employees.

## V. ADA AND REHABILITATION ACT

Plaintiff asserts a claim of disability discrimination under the ADA and Rehabilitation Act. FAC ¶¶ 159-67. She contends that the entity defendants, Bexar County and UHS, failed to reasonable accommodate her known mental disability. *Id*. ¶ 161. She further contends that she has alleged a prima facie case of discrimination. *See id*. ¶¶ 163-67.

"Congress enacted the ADA in 1990 to remedy widespread discrimination against disabled individuals." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674 (2001). In order to give effect to "its sweeping purpose, the ADA forbids discrimination against disabled individuals in major areas of public life, among them employment (Title I of the Act), public services (Title II), and public accommodations (Title III)." *Id*. (footnotes omitted). Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

State and local "prisons fall squarely within the statutory definition of 'public entity,' which includes 'any department, agency, special purpose district, or other instrumentality of a State or States or local government.'" *Pa. Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 210 (1998) (quoting 42 U.S.C. § 12131(1)(B)). Further, "[m]odern prisons provide inmates with many recreational activities, medical services, and educational and vocational programs, all of which at least theoretically benefit the prisoners (and any of which disabled prisoners could be excluded from participation in)." *Id.* (citations and internal quotation marks omitted). The Supreme Court has noted that

> it is quite plausible that the alleged deliberate refusal of prison officials to accommodate . . . disability-related needs in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs constituted "exclu[sion] from participation in or . . . deni[al of] the benefits of" the prison's "services, programs, or activities."

*United States v. Georgia*, 546 U.S. 151, 157 (2006) (quoting 42 U.S.C. § 12132).

In short, "Title II of the ADA unambiguously extends to state prison inmates." *Yeskey*, 524

U.S. at 213. And the same rationale applies to inmates and pretrial detainees housed in local prisons

and jails. To obtain relief under the ADA, plaintiffs "must first establish a prima facie case of

discrimination." *Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 671 (5th Cir. 2004). And to

do so,

> a plaintiff must demonstrate: (1) that he is a qualified individual within the meaning
> of the ADA; (2) that he is being excluded from participation in, or being denied
> benefits of, services, programs, or activities for which the public entity is responsi-
> ble, or is otherwise being discriminated against by the public entity; and (3) that
> such exclusion, denial of benefits, or discrimination is by reason of his disability.

*Id*. at 671-72.

As codified in 29 U.S.C. § 794(a), Section 504 of the Rehabilitation Act provides in perti-

nent part that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of

her or his disability, be excluded from the participation in, or be denied the benefits of, or be

subjected to discrimination under any program or activity receiving Federal financial assistance."

> The language of Title II generally tracks the language of Section 504 . . . and, Con-
> gress' intent was that Title II extend the protections of the Rehabilitation Act to
> cover all programs of state or local governments, regardless of the receipt of federal
> financial assistance and that it work in the same manner as Section 504.

*Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000) (footnote, citation, and internal quotation

marks omitted). Furthermore, "[j]urisprudence interpreting either section is applicable to both."

*Id*.

> The prima facie case of discrimination under the Rehabilitation Act is operationally
> identical to the test under the ADA, requiring a plaintiff to allege: (1) the existence
> of a program or activity within the state which receives federal financial assistance;
> (2) the plaintiff is an intended beneficiary of the federal assistance; and (3) *the
> plaintiff is a qualified handicapped person, who solely by the reason of her handi-
> cap has been excluded from participation in, been denied benefits from, or other-
> wise has been subject to discrimination under such program or activity.*

*Melton*, 391 F.3d at 676 n.8.

"In addition to prohibiting discrimination, the ADA and the Rehabilitation Act—unlike Title VI—'impose upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals.'" *Smith v. Harris Cnty.*, 956 F.3d 311, 317 (5th Cir. 2020) (quoting *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005) and citing *Tennessee v. Lane*, 541 U.S. 509, 531 (2004)). "To succeed on a failure-to-accommodate claim, a plaintiff must prove: (1) he is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered entity; and (3) the entity failed to make reasonable accommodations." *Ball v. LeBlanc*, 792 F.3d 584, 596 n.9 (5th Cir. 2015). At the motion-to-dismiss stage, however, proof is not required – the relevant inquiry is whether the operative complaint contains enough factual allegations to state a plausible claim.

A person is disabled under both the ADA and RA when he or she "has 'a physical or mental impairment that substantially limits one or more major life activities.'" *Id.* at 596 & n.10 (quoting 42 U.S.C. § 12102(1)(A) and in footnote recognizing that the RA incorporates the ADA definition of disability). Typically, plaintiffs "satisfy the knowledge element by showing that they identified their disabilities as well as the resulting limitations to a public entity or its employees and requested an accommodation in direct and specific terms." *Smith*, 956 F.3d at 317. "When a plaintiff fails to request an accommodation in this manner, he can prevail only by showing that 'the disability, resulting limitation, and necessary reasonable accommodation' were 'open, obvious, and apparent' to the entity's relevant agents." *Windham v. Harris Cnty.*, 875 F.3d 229, 237 (5th Cir. 2017) (quoting *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 164 (5th Cir. 1996)).

In addition, a "plaintiff asserting a private cause of action for violations of the ADA or the RA may only recover compensatory damages upon a showing of intentional discrimination." *Delano-Pyle v. Victoria Cnty.*, 302 F.3d 567, 574 (5th Cir. 2002); *accord*, *Smith*, 956 F.3d at 318. While the Fifth Circuit has rejected application of the "'deliberate indifference' standard . . . to

public entities for purposes of the ADA or the RA," it has recognized that "to receive compensatory damages for violations of the Acts, a plaintiff must show intentional discrimination." *Delano-Pyle*, 302 F.3d at 575.[4] "Though intent is a necessary element of a damages claim," the Fifth Circuit has "declined to adopt a specific standard of intent." *Miraglia v. Bd. of Sup'rs of La. State Museum*, 901 F.3d 565, 574 (5th Cir. 2018). For now, the Fifth Circuit relies "on the widely accepted principle that intent requires that the defendant at least have actual notice of a violation." *Id.*

In this case, there is no allegation that Plaintiff requested any accommodation in direct and specific terms. But she alleges that her disability was known and obvious to agents of the respective entities. *See*, *e.g.*, FAC ¶¶ 33, 161, 164-65. Reading the FAC as a whole, accepting well-pled facts as true, and construing all reasonable inferences in the light most favorable to Plaintiff, the Court finds enough factual allegations regarding the obviousness of her resulting limitations and necessary reasonable accommodation.

Because Plaintiff seeks monetary damages in this action, *see* FAC at 33-34 (setting out prayer for relief), she must ultimately show intentional discrimination for her ADA/RA claim. But at this point, her operative pleading need only contain enough factual allegations to state a plausible

---

[4] Although the rejection of the deliberate indifference standard in this context has been questioned, *see Harrison v. Klein Indep. Sch. Dist.*, 856 F. App'x 480, 484 n.4 (5th Cir. 2021) (per curiam); *PlainsCapital Bank v. Keller Indep. Sch. Dist.*, 746 F. App'x 355, 361-62 (5th Cir. 2018) (per curiam), it is not this Court's role to alter existing Fifth Circuit precedent based upon a Supreme Court case that predated the decision. As explained in *PlainsCapital*: "It is a well-settled Fifth Circuit rule of orderliness that one panel of our court may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our en banc court." 746 F. App'x at 361 (quoting *Jacobs v. Nat'l Drug Intelligence Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008)). And while there is precedent for a circuit panel to apply Supreme Court precedent that predated a prior panel opinion when the later panel

> declar[es] a clear conflict between [the prior precedent] and [the] "Supreme Court opinion predating the precedent . . . [t]his orderliness caveat has not developed much of a following in the Fifth Circuit, largely one hopes because its premise of a panel and parties who all fail to identify controlling Supreme Court authority is rare.

*Id.* (citing *Wilson v. Taylor*, 658 F.2d 1021, 1034-35 (5th Cir. Unit B 1981)). This orderliness caveat provides no basis for a district court to alter precedent or to apply a conflicting Supreme Court decision that predates precedent of the controlling circuit. By their very nature, rules of orderliness provide order to the judicial system. Without them the system would fall into chaos subject to the whim of a given judge or panel of judges.

ADA/RA claim. She has adequately alleged facts to show that she was disabled by her mental illness, that the Defendants knew of her disability, and that county or UHS personnel failed to provide mental health care during her detention. From her allegations, the Court can reasonably infer that the entity defendants at least had actual notice of the alleged ADA/RA violation. Accordingly, Plaintiff has alleged a disability discrimination claim sufficient to survive the motions to dismiss.

## VI. REQUEST TO AMEND

In response to both motions, Plaintiff requests leave to amend should the Court find her factual allegations deficient. *See* ECF No. 28 at 18; ECF No. 29 at 19. Although she asserts that courts "should freely grant leave to amend when justice requires it," she neither provides any additional facts that she might allege nor makes any significant argument that justice requires another amendment in this case. *See* ECF No. 28 at 18; ECF No. 29 at 19. Defendants oppose another amendment. *See* ECF No. 30 at 9; ECF No. 31 at 8.

Because Plaintiff has contended throughout her briefing on both motions that her pleadings are sufficient and because she has presented no facts that she would plead to cure any deficiencies in another amended complaint, the Court is well within its discretion to deny the requested amendment. *See Edionwe v. Bailey*, 860 F.3d 287, 294 (5th Cir. 2017) (affirming denial of leave to amend on indistinguishable circumstances). The Court denies Plaintiff's requests to amend.

## VII. CONCLUSION

For the reasons set forth above, the Court **GRANTS IN PART AND DENIES IN PART** the motions to dismiss (ECF Nos. 22 and 23) now before the Court. The motions are granted only to the extent that the Court (1) **DISMISSES** Claim 1 as to Sheriff Salazar in his individual capacity; (2) **DISMISSES** certain aspects of Claim 1 as to UHS and Bexar County as set forth herein; and (3) **DISMISSES** the official capacity claims asserted against Sheriff Salazar (Claim 1) and

Doe Defendants (Claim 2) as duplicative – the claims will proceed against Bexar County and UHS, except as set forth in this Memorandum Opinion and Order. Claims 2 and 3 will proceed against the Doe Defendants in their individual capacities and the ADA/RA claims shall proceed against the entity defendants. **Because the Court dismisses all claims against Sheriff Salazar he is dismissed as a defendant and the Clerk of Court shall note on the docket that he has been terminated as a party.**

It is so ORDERED this 19th day of July 2022.

**JASON PULLIAM**
**UNITED STATES DISTRICT JUDGE**